**Robert F. BROWN et al.**

v.

**The UNITED STATES.**

No. 30–64.

United States Court of Claims.

May 15, 1970.

Thomas J. Lynch and Arthur K. Mason for plaintiff; Edward H. Foley, attorney of record; Edmond M. Hanrahan, New York City, of counsel.

Joseph Kovner, Washington, D. C., with whom was Asst. Atty. Gen. Johnnie M. Walters, for defendant; Philip R. Miller, and Knox Bemis, Washington, D. C., of counsel.

Before COWEN, Chief Judge, REED, Justice (Ret.),* LARAMORE, DURFEE, DAVIS, COLLINS, and SKELTON, Judges.

## OPINION

PER CURIAM:

This income tax refund suit was referred to Trial Commissioner Saul Richard Gamer with directions to prepare and file his opinion, findings, and recommended conclusion of law. The commissioner has done so, and the plaintiffs have excepted to his opinion and recommended conclusion, as well as to certain findings. The defendant urges that the court adopt the commissioner's report as it stands. The case has been submitted to the judges on oral argument of counsel and the briefs of the parties.

The court agrees with the trial commissioner's opinion, findings, and recom-

* Sitting by designation.

mended conclusion of law. The starting point for cases of this type is that courts should examine, carefully and warily, attempts to use the tax system to obtain a benefit or advantage where the only possibility of any real benefit or advantage comes through the tax mechanism itself —where, to put it conversely, there would be no substantial benefit or advantage through the transaction alone, apart from the operation of the particular tax mechanism employed by the taxpayer. See Rothschild v. United States, 407 F.2d 404, 186 Ct.Cl. 709 (1969), and cases cited. Such attempts may not always be rejected *per se,* but we think that a universal precondition of acceptance for tax purposes is that the taxpayer "turn square corners" and fulfill every legislative requirement of the tax law, correctly construed. Those who seek their only good through the operation of the tax system should not ask for liberality or generosity of interpretation.[1] This is obviously such a case. We are entitled, therefore, to gauge taxpayers' claims against the statute read without any predisposition in their favor.

The dominant ingredient which affects us very strongly is the nature of the "chain" group, and of the intra-group transactions, which plaintiffs utilized. These show that Kuhn, Loeb & Co. was not, on those occasions, acting as a "dealer" within the meaning of the Internal Revenue Code (§ 171(d)).[2] If some thirty or forty well-to-do individuals (not brokers, securities dealers or investment bankers, but simply rich men moved by the same prospect of tax-induced benefit which influenced Kuhn Loeb) had banded together, after 1950, to form a "high-coupon tax-exempt bonds investors' club", they could have had the same transactions within their own private circle as Kuhn Loeb carried on with its own "chain" group, and for the very same goal. This would not, we feel sure, have made those individual investors "dealers" for the purposes of § 171(d). Commissioner Gamer gives the reasons why. As he also points out, the happenstance that Kuhn Loeb was a "dealer" in its other activities does not alter this result, though it may create for the moment an eye-catching *trompe l'oeil.* What taxpayers did was to tack on to their regular dealers' business a separate membership in a special and private "high-coupon tax-exempt bonds investors' club", which any set of non-dealer taxpayers in the upper brackets could have formed. The passing of the bonds back and forth within this select company, in an effort to meet the holding-for-less-than-30-days requirement, did not comply with the Congressional exception which was intended only for a true and realistic dealership in these high-coupon tax-exempt securities. Just because Kuhn Loeb happened to be a dealer in other activities did not give it a preference over non-dealer investors who, as we have said, could have created the same sort of "chain group" or "investors' club". Section 1236 of the Code,[3] which plaintiffs

---

1. Unless Congress unequivocally so indicates—which is not true here.

2. The word "dealer" expresses compendiously a taxpayer who holds bonds which are stock in trade or of a kind properly included in inventory or held primarily for sale to customers in the ordinary course of trade or business (26 U.S.C. § 171(d)).

3. "§ 1236. *Dealers in securities*

   "(a) *Capital gains.*—Gain by a dealer in securities from the sale or exchange of any security shall in no event be considered as gain from the sale or exchange of a capital asset unless—

   "(1) the security was, before the expiration of the 30th day after the date of its acquisition, clearly identified in the dealer's records as a security held for investment or if acquired before October 20, 1951, was so identified before November 20, 1951; and

   "(2) the security was not, at any time after the expiration of such 30th day, held by such dealer primarily for sale to customers in the ordinary course of his trade or business.

   "(b) *Ordinary losses.*—Loss by a dealer in securities from the sale or exchange of any security shall, except as otherwise provided in section 582(c), (relating to bond, etc., losses of banks), in no event be considered as loss from the sale or exchange of property which is not a capital

invoke because these bonds were not "clearly identified" on the Kuhn Loeb records as securities held for investment, was obviously designed for the Service's benefit, to protect the revenue against the indiscriminate use of certain preferential Code provisions; the section should not be turned on its head so as to allow taxpayers to take advantage of still other preferential provisions by invoking their own failure to designate the securities for investment as conclusive that the bonds were held primarily for sale.

We agree, too, with Commissioner Gamer that the history of the 1950 and 1958 legislation does not call for a ruling in favor of taxpayers. Congress was certainly aware in 1950 that some investment houses were taking advantage of the then unlimited permission for dealers not to amortize the premiums on high-coupon tax-exempt bonds. But there is no indication that it was aware of "daisy chain" groups (or that they even existed at the time). What Congress was trying to forestall, on that occasion, was the then use by dealers of this benefit through their ordinary sales to their customers in the regular course of their business. Those were the "artificial losses" to which the committee reports referred. See Appendix B to Commissioner Gamer's opinion. At that time, when there was no 30-day or other time-limit on sales, dealers, including underwriters, were getting the benefit of "artificial losses" allowed by the non-amortization provision of the Code by means of regular sales to their ordinary customers—not through a "chain" or a

private in-group. Congress did not foresee, so far as we can tell, that if it put a stop to this practice of selling in normal course to customers, but for the dealer's own convenience left a 30-day exception, houses like Kuhn Loeb would then seek to continue the advantage by creating special investor's groups or "clubs" to sell and resell the bonds to each other within 30 days. There was no intimation in 1950 that Congress consciously or deliberately sanctioned that subsequent practice which was unknown at the time and which would not fit within the accepted connotations of dealership.

As for the 1958 amendments, we can agree that Congress and the Treasury assumed, at that point in time, that the then-existing statute did not prevent use of these "chain" groups to attain the non-amortization privilege. But, as the trial commissioner indicates, that does not end the matter. There were no judicial decisions on the issue, Congress did not undertake a study of the existing legislation, and it did not purport to make a formal pronouncement of what the law then was. It simply assumed *arguendo*, so to speak—along with the Treasury at that moment—that the law permitted something which it did not like, and it acted to make clear that for the future the rule would in any event be otherwise. *Cf.* United States v. Midland-Ross Corp., 381 U.S. 54, 59–60, 85 S.Ct. 1308, 14 L.Ed.2d 214 (1965). Moreover, it is by now settled that "[v]iews expressed in a subsequent session of Congress * * * can have but little relevance to the intent of an earlier session of Congress". Pacific Nat'l Ins. Co. v. United States, 422 F.2d 26, 32 (9th Cir., Feb. 6, 1970).[4]

asset if at any time after November 19, 1951, the security was clearly identified in the dealer's records as a security held for investment.

"(c) *Definition of security.*—For purposes of this section, the term 'security' means any share of stock in any corporation, certificate of stock or interest in any corporation, note, bond, debenture, or evidence of indebtedness, or any evidence of an interest in or right to subscribe to or purchase any of the foregoing."

4. See United States v. Southwestern Cable Co., 392 U.S. 157, 170, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968) ; Haynes v. United States, 390 U.S. 85, 87, 88 S.Ct. 722, 19 L.Ed.2d 923, n. 4 (1968) ; United States v. Price, 361 U.S. 304, 313, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960) ; Rainwater v. United States, 356 U.S. 590, 593, 78 S. Ct. 946, 2 L.Ed.2d 996 (1958). Cf. United States v. W. M. Webb, Inc., 397 U.S. 179, 194, 90 S.Ct. 850, 25 L.Ed.2d 207 (1970) ; United States v. Wise, 370 U.S.

One final remark. We are not using, and we do not think the trial commissioner used, the single factor of subjective investment-mindedness as *the* test of taxability under these particular statutory provisions. We assume that a dealer who happened to sell some of these bonds in the taxable years (1955 and 1956) to customers in the ordinary course of his regular bond business—not to a unique "chain" group or "club"— would be able to have the privilege of non-amortization on those bonds even though his primary concerns would not be those of the normal dealer. Similarly, we assume that the dealers to whom Congress referred in 1950 (dealers whose sales were in the ordinary course of their business) could properly take the benefit. The differentiating element here is, as we have emphasized, the special "chain" group within which the sales and purchases were made. Our result turns on that significant component of the transactions.

In this light, the court adopts Commissioner Gamer's opinion, findings and recommended conclusion of law, as hereinafter set forth and as supplemented by the foregoing discussion, as the basis for its judgment in this case. Therefore, plaintiffs are not entitled to recover and the joint petition is dismissed.

## OPINION OF COMMISSIONER

GAMER, Commissioner: In a joint petition, plaintiffs sue to recover alleged overpayments of income taxes for the years 1955 and 1956 in the amounts of approximately $322,000 and $380,000, respectively, plus interest.

During such years, plaintiffs were members of the firm of Kuhn, Loeb & Co., a partnership regularly engaged in underwriting and dealing in securities of all types, including those issued by states of the United States and their po-

litical subdivisions (hereinafter sometimes referred to as "municipal" securities).[1]

In the joint return filed by each of the plaintiff-partners and his wife for the years in question, there was included in gross income the partner's distributive share of partnership net income as indicated by the partnership information returns filed by Kuhn, Loeb & Co. After audit of the information returns by the Internal Revenue Service and disallowance of losses on the sales of certain municipal obligations claimed by the partnership, increases were made in the respective distributive shares of each plaintiff-partner. Deficiencies were assessed and paid by the respective partners. Timely claims for refund were filed and subsequently disallowed by the Service.

The claimed losses which are at issue herein arise from the sales by Kuhn, Loeb & Co. during the two years in question of a certain type of municipal bond. This type was characterized by (a) the short period of time to maturity (generally less than two years but in no case more than five years) and (b) a high-coupon or stated interest rate (from four to six percent). Because the interest rate on these particular bonds was higher than the rate prevailing in the market for other short-term municipal securities of comparable quality, these high-coupon securities sold at a high premium. The effect of this premium was to make the ultimate yield on the bond similar to that of other short-term municipal securities.

To use an oversimplified example, if a state or a political subdivision thereof wished to borrow a specific amount of money for a given period of time and announced that it would accept bids from underwriters on securities it would issue, it would make little difference to it if the winning bid called for the issuance

---

405, 411, 82 S.Ct. 1354, 8 L.Ed.2d 590 (1962); Fogarty v. United States, 340 U.S. 8, 13–14, 71 S.Ct. 5, 95 L.Ed. 10 (1950); United States v. United Mine Workers, 330 U.S. 258, 281–82, 67 S.Ct. 677, 91 L.Ed. 884 (1947).

1. Included in the listed plaintiffs are the wives of the partners and executors of estates of deceased partners.

of the more conventional type of low-interest one percent bond of $100 face value, or a high-interest six percent bond of $100 face value with a five-dollar premium, for which it would, therefore, receive $105. In either case, the net cost of the borrowing to the municipality would be one dollar or one percent The ordinary holder of the bond too would experience a net yield generally comparable to that from similar municipal bonds with lower rates of interest. Since he paid five dollars extra to obtain the six percent interest, he would realize a net yield of only one dollar, or one percent, if he held on to maturity.

If the bond was not held to maturity, and was instead sold, the market price would constantly reflect the fact that less time remained for obtaining six percent, i. e., the premium would decrease, or "run off" as the maturity date approached, at which date the holder would receive only the $100 face value. It was the effect of the combination of the high interest during the period of holding and the premium runoff that provided the holder of such a bond with a net return comparable to that of a more conventional low-interest, nominal-premium municipal bond.

This being so, one may properly wonder why such high-interest, high-premium bonds ever came into being. The answer is grounded upon certain provisions of the income tax laws which existed during the period here involved and their interpretation by a group of investment banking firms including Kuhn, Loeb & Co., which was engaged in dealing in municipal securities. These laws and interpretations, and the practices of such firms pursuant thereto, were as follows:

As stated, each bond here in question was purchased by Kuhn, Loeb & Co. at a premium. The bonds were all of the type generally known as tax-free or tax-exempt, i. e., they were of the category described in section 103 of the Internal Revenue Code of 1954 the interest from which is not included in gross income for federal income tax purposes.

Special Code provisions specifically dealt with bond premiums. Section 1016 (a) (5) required that "in the case of any bond (as defined in section 171(d))" an adjustment in respect of the basis of the bond should be made to the extent of the amortizable bond premium.[2] The referred-to section 171(d), however, excludes from the "bond" definition "any such obligation which constitutes stock in trade of the taxpayer or any such obligation of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or any such obligation held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Thus, section 1016 (a) (5), by its reference to section 171 (d), in effect required amortization of premiums only on bonds held by investors, and not by dealers. Furthermore, section 1016(a) (6) specifically required a basis adjustment "in the case of any municipal bond (as defined in section 75(b)), to the extent provided in section 75(a) (2)." However, although section 75 (headed "Dealers in tax-exempt securities") again required in the instances set forth in subsection (a) (headed "Adjustment for bond premium") that the basis of a short-term municipal bond held "primarily for sale to customers in the ordinary course of his trade or business," be reduced by the amortizable bond premium, nevertheless section 75 (b) (headed "Definitions") excludes from the definition of "short-term municipal bond" an obligation "sold or

---

2. "Amortizable bond premium" being defined in section 171(b), "bond premium" generally being determined "with reference to the amount payable on maturity" (section 171(b) (1) (B) (i)), and "amortizable bond premium of the taxable year" being the "amount of the bond premium attributable to such year" (section 171

(b) (2)). Section 171(a) (1) provided that on taxable bonds, the "amortizable bond premium for the taxable year shall be allowed as a deduction," whereas section 171(a) (2) disallowed any such yearly deductions on tax-exempt bonds. No such deductions are claimed in this case.

otherwise disposed of by the taxpayer within 30 days after the date of its acquisition by him," or whose "earliest maturity or call date is a date more than 5 years from the date on which it was acquired by the taxpayer." Thus, although section 1016(a) (6), by its reference to section 75, in effect required amortization by dealers of short-term municipal bonds, said section 75 specifically excludes from its definition of such bonds any bond held by the dealer for less than thirty days.[3]

Kuhn, Loeb & Co. concluded that, under the aforesaid provisions, it was, as a "dealer in tax-exempt securities," entitled, on the sale of a short-term municipal bond (i. e., with a maturity date of less than five years), which was of the type properly includable in inventory or held primarily for sale to customers in the ordinary course of its business, not to make an adjustment to its cost basis with respect to any part of the bond premium, provided its holding period did not exceed thirty days. If this were so, such ability not to amortize a high-interest, high-premium bond would be of real value to it from a tax point of view because, as a consequence of paying a premium price for the bond and selling it on a nonadjusted cost basis, its sales price would (exclusive of accrued interest) invariably be less than its cost because of premium runoff, thus establishing a loss which would reduce its "gross income derived from business" under section 61 of the Code, and under which a dealer in securities includes or deducts from ordinary income profits and losses derived from the conduct of its regular business. As above set forth, nondealers, or dealers holding such bonds for more than thirty days, would be required to make appropriate cost adjustments by amortizing the premium in the amount applicable to the holding period, thus experiencing no loss on the sale. However, despite the loss that Kuhn, Loeb & Co. would incur on the sale of the bond, it knew that the interest that would accrue during the holding period would exceed the runoff of the premium by an amount sufficient to provide an actual return from the bond that would be similar to the return from comparable municipals with lower interest rates. Thus, each bond of this type was purchased with the knowledge that no profit would be made on it apart from the accrual of interest. No gain with respect to the sale of the security itself was anticipated.[4] The ultimate purpose was to

---

3. The pertinent statutory provisions are set out in Appendix A of this opinion.

4. The following example is illustrative:

On March 14, 1955, Kuhn, Loeb & Co. bought a bond issued by Albuquerque, New Mexico, which had a face amount of $51,000, a maturity date of July 1, 1956, and a stated rate of interest of six percent. The yield, or effective rate of interest to maturity, of such a security was determined by the market, and in this instance was 1.35 percent. Because of the considerable difference between the six percent stated rate and the 1.35 percent prevailing market yield, the bond sold at a substantial premium. The exact amount of the premium, calculated by use of tables, depended upon the face amount of the bond, its stated rate of interest, the yield prevailing in the market, and the length of time remaining until maturity. On the March 14, 1955 purchase date, the premium on this bond was $3,038.19.

When Kuhn, Loeb & Co. bought such a bond, it paid the seller not only the face amount plus the premium, but also an amount attributable to accrued interest. This amount represented the amount of the stated interest allocable to that portion of the period of time that had elapsed from the bond's last interest date up to the day upon which the bond was purchased. In this instance, accrued interest for 72 days amounted to $603.62. Thus the total outlay of Kuhn, Loeb & Co. for the bond was:

| | |
|---|---|
| Face amount | $51,000.00 |
| Premium | 3,038.19 |
| Accrued interest | 603.62 |
| Total outlay | 54,641.81 |

Kuhn, Loeb & Co. sold this bond on April 6, 1955, 23 days after it had bought it. On that date, the yield, as determined by the market, was unchanged (1.35 percent), but the premium was now reduced to $2,896.15, $142.04 less than on March 14, 1955, because the bond was 23 days nearer maturity. However, the same 23-

claim for federal income tax purposes a loss deduction in the amount of the decrease in the premium during the holding period but which would not recognize the high-interest accrual during such period that had more than offset the premium runoff. It would thus receive a double tax benefit, i. e., tax-exempt interest and a tax loss for the premium (the existence of which on tax-exempt bonds is itself attributable to the tax-exempt feature).

So attractive from a tax standpoint did these high-interest, high-premium, short-term municipal bonds appear to Kuhn, Loeb & Co. and a group of other investment bankers dealing in municipals that, during the period here involved, such bonds practically usurped the short-term municipal bond market. For instance, in 1949, about which time the high-interest, high-premium bonds began to appear on the financial scene in any significant number, of 143 bids made by underwriters to the various housing authorities in Massachusetts, the successful bids in 131 instances were low-coupon bids of the conventional variety. However, by 1954, all 42 successful bids were high-interest, high-premium. In 1955, 52 of the 53 successful bids were high-interest, high-premium, and in 1956, 15 of the 16 successful bids were of this type. The competition for these issues was keen. Indeed, so lively was it that the municipalities began to enjoy a lower net interest cost on such a high-interest issue than the municipal bond market indicated was the then prevailing yield, i. e., the premium offered by said group of underwriters to obtain the issue reduced the issuer's net cost below market.

Such a dealer could afford to receive a lower return on his initial investment, and still receive a greater after-tax return on his investment than could the ordinary investor. Naturally, the conventional low-interest, nominal-premium, short-term municipal bond practically disappeared from the scene.

Since it was necessary, in order to qualify for nonamortization of premium, to dispose of any such bond within thirty days, the practice developed, among the group of investment bankers who participated in the acquisition of these bonds, of passing them on to one another, "in a so-called daisy-chain procedure," [5] at intervals of less than thirty days. During the period here in question, about thirty-to-fifty firms, including Kuhn, Loeb & Co., practically monopolized the high-interest, high-premium, short-term municipal bond market, constantly selling the bonds to one another at less than 30-day intervals and until they matured, each one taking the runoff of premium and the accrual of high-interest attributable to the number of days of its holding period. Bonds of the same issue would make the rounds in such fashion that it was possible for the same firm to own them repeatedly. A "chain" might consist of only three firms, the third dealer often reselling the bond to the first dealer. Chains of three or four dealers often held bonds of a particular issue for major portions of the two-year period here in question. For example, in one instance, Kuhn, Loeb & Co. repurchased from the same dealer the same quantity of at least one particular issue (Albuquerque, New Mexico,

---

day holding period had resulted in there now being 95 days' accrual of interest on the bond, amounting to $796.44, $192.82 more than on March 14, 1955. Thus, the total proceeds to Kuhn, Loeb & Co. from the sale were:

| | |
|---|---|
| Face amount | $51,000.00 |
| Premium | 2,896.15 |
| Accrued interest | 796.44 |
| Total proceeds | 54,692.59 |

Thus the net return to Kuhn, Loeb & Co. from holding the bond was $50.78

(the total proceeds of $54,692.59 less the total outlay of $54,641.81). This represented a 1.475 percent annual rate of return on the $54,641.81 outlay, which was in line with the yield on similar municipal bonds with lower stated rates of interest.

5. S.Rep. No. 1983 on the Technical Amendments Act of 1958, 85th Cong., 2d Sess. 13 (1958–3 Cum.Bull. 922, 934).

six percent bond issue) eight times in seventeen months.

The dealings in these bonds, as above-described, were marked by certain other characteristics. Kuhn, Loeb & Co. and the other dealers engaged in the purchases and sales realized no commission or dealer concessions when they bought or sold the type of short-term municipals here involved. Furthermore, the bonds were not advertised for sale in the trade publication, the so-called "Blue List," that listed the tax-exempt bonds dealers had available for sale. In fact, these securities were not advertised at all. All purchase and sale transactions relating to them were carried out over the telephone by the thirty-to-fifty dealers who knew which others would be interested in holding such securities. Moreover, Kuhn, Loeb & Co. did not purchase such high-interest, high-premium bonds for the account of any of its other dealer or investor customers who held other types of tax-free obligations. Obviously, such a customer would not be interested in the purchase of a bond whose yield was less than that of bonds of comparable stability and maturity. Thus, Kuhn, Loeb & Co. never broke up the high-interest municipals into smaller lots for resale, nor did it ever sell such a bond to a retail customer. Finally, as opposed to the holding of other obligations on which there was no requirement that they be sold at any particular time, high-interest, high-premium, short-term municipals were specifically recorded on the books so that they would be sold within thirty days of purchase regardless of market conditions.[6] In practice, Kuhn, Loeb & Co. held these securities for at least twenty days.

In 1955 Kuhn, Loeb & Co., in computing its gross income for tax purposes, deducted losses on 192 sale transactions of the type described and in 1956 similarly deducted losses on 165 such sales.

In 1958, because of the described "daisy-chain" practices engaged in by Kuhn, Loeb & Co. and the other dealers, Congress, by section 2 of the Technical Amendments Act of 1958, amended section 75 of the Internal Revenue Code of 1954 by removing the 30-day exception in the case of losses, thus requiring dealers in such instances to amortize bond premium and adjust the cost basis. The new provisions were made applicable only to obligations purchased after December 31, 1957.

Plaintiffs' case is simply stated. They say that, as a dealer in securities, Kuhn, Loeb & Co. was required, in calculating its "gross income" under the general provisions of section 61(a) (i. e., "all income from whatever source derived"), which includes "gross income derived from business," to include or deduct from ordinary income profits and losses derived from the conduct of its regular business. Since there is no dispute that the bonds in question were purchased at a price in excess of the proceeds of the sale, it is plain, plaintiffs argue, that Kuhn, Loeb & Co. is entitled to the losses claimed in the amount of such excess. Because there is no Code provision, they contend, which would operate to bar the losses incurred, "[t]his simple application of the general rule disposes of the case." Pltf. Brief, p. 18.

The exemption section 171(d) effects with respect to dealers complying with the above-described basis adjustment provisions of section 1016(a) (5), plaintiffs argue, indicates that "[t]he basic scheme of the section deliberately distinguishes between the dealers and nondealers and contemplates the allowance of the double benefit to dealers." Pltf. Brief, p. 20.

The only other applicable basis adjustment provision, plaintiffs point out, is section 1016(a) (6), which requires a basis reduction with respect to short-term municipal bonds, but again this pro-

---

6. Kuhn, Loeb & Co.'s ledger account for each such security carried the notation "DDRO," which stood for "Domestic Department Roll Over," to remind the pertinent personnel that the security was to be sold within thirty days after its purchase.

vision is, as shown, applicable only to such bonds as are defined in section 75 (b), and that section defines a "short-term municipal bond" as one held for thirty days or more. There is no dispute that, with respect to all the sale transactions here involved on which losses are claimed, the obligations were held for less than thirty days. Thus, say plaintiffs, no adjustment of basis is required under section 1016(a) (6) either. "Indeed," they argue, "a Congressional intent not to require any basis adjustment is positively indicated by the deliberate, specific and precise exceptions contained in section 1016(a) (5) and (6) which exclude bonds held by dealers for less than 30 days," the legislative history of the 30-day exclusion making plain, they further contend, that it was intended as a relief provision for dealers. Thus, plaintiffs conclude, there is evidenced a clear Congressional intent to allow dealers "a double benefit stemming from the receipt of tax-exempt income and the realization of an ordinary loss * * *." Pltf. Brief, p. 21.

There can be no question, say plaintiffs, that Kuhn, Loeb & Co. is and has been for one hundred years one of the largest dealers in securities of the type here involved, as well as other types; that it bought and sold such securities (as well as others) from and to the thirty-to-fifty other dealers hereinabove mentioned on a regular basis; and that, therefore, all of the transactions here involved constituted, in the language of the exclusionary section 171(d), "obligation[s] held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." And there was, they further argue, compliance with the additional and independent section 171(d) exclusion provision with respect to bonds "of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year * * *" (although plaintiffs emphasize that, because the two provisions are separated by the word "or," compliance with either one would qualify for the exclusion). There is no

dispute, plaintiffs point out, that ever since 1952, when Kuhn, Loeb & Co. first began acquiring bonds of the type here involved, it carried them in its inventory account (as distinguished from its investment account); that Kuhn, Loeb & Co.'s inventory method was the standard one of cost-or-market, whichever is lower; that at the end of the taxable year, all such bonds were "rated to market," i. e., reduced to market value, wherever cost exceeded the then market value, with Kuhn, Loeb & Co.'s tax returns being filed on such basis; and that from 1952 through the 1955–1956 years here involved, each such return was audited by defendant and all these inventory rating losses allowed. This amounts, say plaintiffs, to a contemporaneous concession by defendant that the bonds here involved properly formed a part of Kuhn, Loeb & Co.'s inventory, and as such were properly excludable under section 171(d).

These contentions cannot be accepted. They are all grounded upon the basic assumption that, with respect to the transactions in question, Kuhn, Loeb & Co. was acting as a "dealer" trading in obligations properly includable in inventory, or "held * * * primarily for sale to customers in the ordinary course of * * * business." It seems plain, however, that with respect to the transactions here in question, Kuhn, Loeb & Co. was not acting as such a "dealer."

Of course, Kuhn, Loeb & Co. is, and has been for a hundred years, a "dealer" in municipal securities. But a dealer in securities can also be an investor in securities, as Kuhn, Loeb & Co. was, having both "inventory" and "investment" accounts. And, insofar as "inventory" connotes a holding out for profitable sale by wholesalers or retailers to any customer in the trade or industry, the bonds in question were not properly classifiable as "inventory." They were, instead, deliberately held outside the stream of commerce for periods up to thirty days for the realization of tax-free interest income, a typical investment objective. During such holding period, the bonds were not held for "sale" to "customers."

That the duration of the holding was the relatively short period of twenty-to-thirty days is, in the circumstances here involved, not inconsistent with an investment purpose. Basic to the acquisition purpose was still the realization of a net yield on tax-free municipals for whatever time they were held. Furthermore, due to the often continuous action of the "daisy-chain's" bringing back the same security, the actual length of time a particular security would be held frequently exceeded the twenty-to-thirty days involved in a single holding period. For example, in the previously mentioned instance in which, during a 17-month period, Kuhn, Loeb & Co. held the security eight times, the last holding being to maturity, the eight individual less-than-thirty-day holding periods resulted in a total holding of the security for 198 days, i. e., over six and one-half months.

The normal goal of a dealer or merchant in securities is the making of a profit on the price of the security itself, or, by acting in the traditional manner of middleman or broker, to earn a commission or to enjoy some other dealer concession. See George R. Kemon, 16 T.C. 1026, 1032–1033 (1951). The transactions here involved bore none of these characteristics. There was no hope or expectation of selling the securities at a profit. Instead, the obligations were purchased in anticipation of selling them at a loss. The economic gain to be realized through the buying, holding, and selling was in the nature of interest earned during the holding period, and, in a sense, the artificial tax-deductible loss to which Kuhn, Loeb & Co. thought it was entitled, "artificial" because the premium runoff had already been taken into account in reducing the high interest to the approximate yield level of conventional low-interest, nominal-premium municipals. Whenever Kuhn, Loeb & Co. bought such conventional-type municipals, it hoped to sell them, on acting as a middleman at a price higher than it paid, or to receive commissions or other dealer concessions. Thus, on the transactions here in question, it acted differently, its only economic profit coming from the accrual of interest during its holding period, and not from its buying and selling activities. In such circumstances, it was not acting as a "dealer." A dealer in securities may hold for investment the same type of security in which he maintains a dealer's inventory. E. Everett Van Tuyl, 12 T.C. 900, 905 (1949); Carl Marks & Co., 12 T.C. 1196, 1202 (1949); Stern Brothers & Co., 16 T.C. 295, 313 (1951). The type of purchase, sale, repurchase, etc., each time at a loss and without the realization of a commission or dealer concession, is manifestly outside the ordinary course of a dealer in the securities business. The mere fact that, in addition to obtaining a tax-free yield the measure of which reflects the built-in premium runoff, it was hoped further to increase the overall economic gain by obtaining the additional benefit of realizing an independent, separate, tax loss in the exact amount of such premium runoff, buttresses the conclusion that "investment" was the purpose of the purchase, holding, and selling. In *George R. Kemon, supra,* at 1032–1033, the Tax Court, addressing itself to the question of when a dealer in securities ceases to hold for sale to customers in the ordinary course of business, and instead holds such securities for his own account as a trader or investor, defined a "dealer" in the following terms:

In determining whether a seller of securities sells to "customers," the merchant analogy has been employed. [Citations omitted.] Those who sell "to customers" are comparable to a merchant in that they purchase their stock in trade, in this case securities, with the expectation of reselling at a profit, not because of a rise in value during the interval of time between purchase and resale, but merely because they have or hope to find a market of buyers who will purchase from them at a price in excess of their cost. This excess or mark-up represents remuneration for their labors as a middle man bringing together buyer

and seller, and performing the usual services of retailer or wholesaler of goods. [Citations omitted.] Such sellers are known as "dealers."

"Whether petitioner held the securities at issue primarily for sale to customers in the ordinary course of business or on its own account for some other purpose, such as investment, is essentially a question of fact to be determined in view of all the circumstances surrounding each security." *Stern Brothers & Co., supra,* 16 T.C. at 313. And a comparison of the manner in which Kuhn, Loeb & Co. and the other dealers involved in the "chain" bought, held, and sold high-interest, high-premium municipal bonds with the way in which they operated in regard to other types of securities clearly indicates that such obligations were not held for sale to "customers" in the "ordinary course of business." Because of the belief that they would not be required to amortize the premium, thus giving rise to a tax-deductible loss on the sale, the thirty-to-fifty dealers who participated in these transactions felt that they could afford to bid for the issuance of bonds with a net (after premium) lower interest yield than could ordinary investors in municipals, and still (because of the hoped for tax loss) receive a greater overall return from the investment in these bonds. Thus, since these obligations did not return as high a yield as others of comparable stability and maturity, Kuhn, Loeb & Co. could not, as a practical matter, perform its ordinary business function of selling them to its regular customers who had previously purchased such type of security. Accordingly, by entering the municipal bond market with the ability to hold such bonds at a lower yield, Kuhn, Loeb & Co. and the other limited circle of "chain" dealers actually effectively eliminated from the market the customers who had previously invested in such obligations, and instead, substituted themselves as such investors. Furthermore, even when Kuhn, Loeb & Co. did sell the bonds to its other "customers," *i. e.,* the other members of the "chain,"

it did not do so in a manner consonant with the concept of a transaction in the ordinary course of business, there being no commission charged or dealer concession required, and all sales being at a loss. The bonds were not advertised in the trade publications which covered municipal obligations, but were sold over the telephone only to the other "chain" dealers. Moreover, the bonds were required to be sold within a specified period of time regardless of market conditions. Indeed, Kuhn, Loeb & Co. never broke up an issue of the high-coupon municipals into smaller lots for resale. As shown, such bonds were never sold to retail customers. Some of the thirty-to-fifty dealers were in fact, customers for ordinary municipals. However, with respect to the high-coupon bonds they were, instead, merely members of a group who took turns holding the bonds for short, predictable, periods and then passing them on to other members of the group. Each dealer was in effect buying, holding, and selling for his own account, rather than buying to resell to customers.

Finally, that Kuhn, Loeb & Co. included the obligations in its "inventory" does not mean that that treatment was correct. "The fact that a particular security is carried in general inventory alongside securities which are a part of the dealer business does not exclude the possibility that it was acquired and is held for investment * * *." *Stern Brothers & Co., supra* at 315. Nor does the fact that the Revenue Agents failed to realize the impropriety of the yearend ratings-to-market which Kuhn, Loeb & Co. effected on the high-coupon bonds carried in its inventory account, result in anything in the nature of an estoppel against defendant with respect to allowing losses on the sales made on the obligations during the year. An alleged "loss" on a sale would, clearly, raise the issue much more noticeably than would the question of the propriety of bonds resting in the "inventory" account instead of the "investment" account. "It has been held by a long line of cases that

taxpayers may not include in inventory securities which were shown to be held for investment or speculation rather than for dealer purposes." *Carl Marks & Co., supra,* 12 T.C. at 1203.

In summary, the record makes plain that Kuhn, Leob & Co.'s motives for indulging in the transactions in question were the realization of interest and the creation of a tax loss. Such motives are not those of a dealer. Consequently, the obligations in question cannot be treated as having been held for sale to customers in the ordinary course of business. Kuhn, Loeb & Co., therefore, should have periodically amortized the high premiums as required by sections 1016(a) (5) and 171(d), thus reducing its basis in the obligations. High-coupon municipals fall within such definition of "bond" in section 171(d) no matter how short a period of time the bond is held. Therefore, for a "bond" as defined in such section, amortization is required independently of the 30-day provision of section 75. The Commissioner of Internal Revenue's disallowance of the "losses" incurred on the sales was, accordingly, proper.

Nor is there merit to the contention that the legislative history of the pertinent statutory provisions indicates that Congress, with full knowledge of the type of transaction as is here involved, nevertheless intended that dealers engaged in such practices be accorded the double benefit of tax-exempt income and the realization of an ordinary loss. " * * * the legislative record," plaintiffs contend, "refers to the very kind of transactions in which the partnership [Kuhn, Loeb & Co.] engaged, and expresses the Congressional view and mandate that they be treated in the manner proposed by the Plaintiffs." Pltf. Brief, p. 21.

The history of the pertinent statutes is as follows:

The 30-day provision first came into the law as section 203 of the Revenue Act of 1950. Prior to that time, amortization of bond premium was governed by section 126 of the Revenue Act of 1942

(56 Stat. 798, 822–25), which was enacted (as section 125 of the 1939 Code) to correct an "unjustifiable tax discrimination in favor of tax-exempt [bonds] as against taxable bonds." H.R.Rep. No. 2333, 77th Cong., 2d Sess. 47 (1942) (1942–2 Cum.Bull. 372, 410).

Prior to the Revenue Act of 1942 there were no provisions for the amorization of bond premium with respect to either taxable or tax-exempt bonds. Consequently, those holding taxable bonds were required to include in income the entire amount of periodic interest received, regardless of the fact that because of the initial payment of a premium, the actual yield of the bond was less than the stated interest rate. Furthermore, since there was no provision for deducting from income the amortizable premium, *i. e.,* the amount of the premium runoff during the period, the only relief afforded the taxpayer was to recover the premium through the capital loss provisions. Such loss was incurred because there was no provision to reduce the cost basis of the bond to reflect the runoff. Holders of tax-exempt bonds, however, were in the position of receiving tax-free interest, on the one hand, and also deducting the loss under the capital loss provisions.

To remedy this situation the Revenue Act of 1942 provided that in the case of a taxable bond the holder was given the election of periodically amortizing the bond premium, adjusting the basis to reflect the runoff, and deducting from ordinary income the amortizable bond premium. Thus, the amount of the deduction was equivalent to the reduction in basis, and the bondholder received such a deduction instead of a capital loss attributable to the premium. To equate the treatment of holders of tax-exempt bonds with that afforded holders of taxable bonds, the Act also required that, while the runoff attributable to such a bond could not be deducted from income, it was nevertheless similarly to be subtracted from basis in order to reflect the periodic decline in value (and to eliminate the capital loss).

These provisions of the Revenue Act of 1942, however, were applicable only to investors in bonds and not to dealers in such obligations since under the newly enacted Code section 125(d), the definition of "bond" excluded any "obligation which constitutes stock in trade of the taxpayer or any such obligation of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or any such obligation held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Therefore, municipal bond dealers continued with respect to bonds held in their inventory or for sale to customers in the ordinary course of business, to receive tax-free interest during their holding periods as well as to realize an ordinary loss from business income upon the sale or resale of those obligations, a loss that was realized only because of the dealer's ability not to amortize the premiums.

Plaintiffs see in this exemption for dealers Congress' "first deliberate decision that dealers in tax-exempt bonds would not be required to adjust their basis on such bonds to take into account the gradual exhaustion of the premium." Pltf. Brief, p. 23. This may well be conceded, but it is not understood how it helps plaintiffs' position since it is plain that Congress was exempting dealers only when they were acting as dealers, i. e., making a dealer's profit from the bond sales. If a dealer assumed the role of an investor, i. e., holding the bonds for interest income, he would, naturally, be subject to the same basis adjustment provisions as any other investor.

Plaintiffs discern reaffirmation by Congress of their "dealers" interpreta-tion in the enactment of the above-mentioned section 203 of the Revenue Act of 1950 which for the first time made dealers subject to the mandatory basis adjustment provisions except as to short-term bonds held thirty days or less.[7] Plaintiffs rely strongly on the legislative history of the section as shown by the committee reports accompanying the enactment, i. e., H.R.Rep. No. 2319, 81st Cong., 2d Sess. 48–50, 83 (1950–2 Cum. Bull. 380, 417–18, 439–40); S.Rep.No. 2375, 81st Cong., 2d Sess. 40–42, 77–78 (1950–2 Cum.Bull. 483, 512–14, 538–39), U.S.Code Cong. Serv. 1950, p. 3053.[8] This history, they argue, demonstrates that Congress was aware of the type of transaction in which Kuhn, Loeb & Co. was engaged, and gave its approval at least to those transactions which took place within the required 30-day period.

The background of the 1950 Act is as follows:

As previously noted, the high-interest, high-premium municipal bond first began to make a significant appearance as a financing mechanism in the period around 1949. The injection of such bonds into the market came to the attention of Congress in 1950. In noting that "[r]ecent bond issues by some States and municipalities have had peculiar characteristics; they include several series maturing within short periods but with extraordinarily high interest rates," the Committees observed that under the Revenue Act of 1942, investors were required to amortize the premiums but "dealers in securities" were not. Dealers could, therefore, "deduct as a loss the difference between the cost of such bonds and their selling price or the amount received at maturity." They further noted that dealers who inven-

---

7. The basis provision was enacted as section 113(b) (1) (I) of the 1939 Code and required a basis adjustment for bond premiums in the case of any "short-term municipal bond (as defined in section 22(o), to the extent provided in Section 22(o) (1) (B))." Section 113(b) (1) (I) was the predecessor of section 1016 (a) (6) of the 1954 Code, the provision herein involved. Section 22(o) defined short-term municipal bonds to include only bonds held more than thirty days. It was the predecessor to the here involved section 75 of the 1954 Code.

8. The pertinent portions of the Senate Committee's report are set forth in Appendix B of this opinion. Such portions are substantially identical with the comparable portions of the House report.

toried their securities at market prices "automatically receive annual deductions of portions of the premiums, since an appropriate amortization is reflected in the market prices shown in their inventories, or in the selling prices if the bonds are sold or mature during the year." It appeared, said the Committees, that these "artificial losses" were being availed of "in substantial amounts * * * by dealers in securities generally, and particularly by members of underwriting syndicates and the security-dealer affiliates of large banks, who have transactions amounting to millions of dollars in State and municipal bonds, to reduce their tax liability on other income." The new statute, the committee reports stated, "is intended to prevent the deduction of such artificial losses, without unduly complicating the accounting procedures of dealers." This would be effected by requiring that, on short-term municipals (*i e.*, not exceeding five-year maturities) held more than thirty days, "the premium paid must be amortized. In the case of dealers who carry their bonds at cost, this amortization will reduce the basis so as to eliminate an artificial loss in the year of the sale or other disposition of the bond, and in the case of dealers who carry their bonds at market prices the amount of the amortization for any year must be used to reduce the cost of sales for that year." [9]

Plaintiffs conclude that the statement in these reports that "artificial losses, in substantial amounts, are availed of by dealers in securities generally, and *particularly by members of underwriting syndicates*" (emphasis supplied) constitutes "a clear recognition by the Committee[s] as to the state of the law in 1950 and a rather precise identification of the partnership Kuhn, Loeb & Co. as being within the class of taxpayers at whom the new legislation was directed." Pltf. Brief, p. 26. It is further argued that "[t]here is no fact present in this case that was not before the Congress in 1950 when it deliberately and intentionally enacted the 30-day provision on which the taxpayers here rely." *Id.*, pp. 27–28.

Surely, insofar as these contentions are based on the supposition that Congress knew of and approved the practices involved in this case, so that Kuhn, Loeb & Co., in connection with such practices, would be entitled to the benefit of enjoying "artificial losses," they must be rejected. There is, again, no indication that Congress was defining, for legal purposes, when a dealer was actually acting as a dealer or when he should be deemed to be acting as an investor. What Congress was making plain was that even if dealers, acting as dealers, held the bonds in inventory for more than thirty days, they would nevertheless have to make a basis adjustment. In other words, if the dealer did not dispose of the bond within thirty days, he would be treated as if he were an investor. Prior to 1950, there was, as noted, no time limit when dealers, acting in a true dealership capacity, could hold a bond in inventory and still realize the "artificial" loss. This is not to say, however, that, under the new Act, if the bond were disposed of in thirty days, the dealer would automatically be entitled to be treated as if he had held the bond as a dealer, even though he had in fact held the bond instead as an investor. Even the 1942 Act did not except dealers from the amortization requirements with respect to all municipal bonds they held. The exception related only to those that constituted inventory stock-in-trade, or were obligations held primarily for sale to customers in the ordinary course of business. It seems plain that what Congress intended in 1950 was that, in those instances in which dealers, acting as dealers, sold true inventory bonds in less than thirty days, they would not be required to calculate the premium runoff for the short holding period involved since this would impose undue bookkeeping hardships in the conduct of their businesses. This is clearly implicit in the statement in the reports that "[s]ection 203 of your com-

9. See Appendix B.

mittee's bill is intended to prevent the deduction of such artificial losses, without unduly complicating the accounting procedures of dealers." On a conventional low-interest municipal bond, which was at that time the dominant mode of financing, the premium was nominal and the amount of a less than 30-day runoff would be minimal. When Congress enacted the 30-day provision the situation was significantly different from that which existed in 1955 and 1956, the two years here involved. As stated, there had only been a relatively small number of high-interest, high-premium bonds issued by the time the bill was passed, and presumably fewer yet at the time of the hearings and reports. Nor is there any indication that there existed at that time anything in the nature of a "daisy-chain" operation, a practice, which Congress could hardly have foreseen, that came into being only as a result of the 30-day provision. In short, the 30-day provision was manifestly intended to benefit dealers in securities in their transactions as dealers. There is no indication that it was intended to inure to their benefit, by allowing "artificial losses," when they acted essentially as investors.

But, plaintiffs argue, the legislative history of section 2 of the Technical Amendments Act of 1958, which amended section 75 of the Revenue Act of 1954 by ending the 30-day exception in the case of losses, shows that Congress in fact recognized that the "chain" practices involved herein were proper and legal under the 1950 Act. This contention too is unacceptable.

As already indicated, the 1950 Act did not serve to eliminate the use of high-interest, high-premium municipal bonds. On the contrary, the use thereof greatly increased, ultimately becoming, during the two years here involved, the dominant type. The prevalence of this type of bond is attributable to the fact that the issuing body was able to borrow at a lower interest rate when the successful bid was for a high-interest, high-premium bond. Plaintiffs forthrightly indicate that the reason for lower net interest rates on high-interest, high-premium bonds, and therefore their prevalence, was the belief of Kuhn, Loeb & Co., and certain others dealing in municipal obligations, that a tax loophole had been created in their favor by the 1950 Amendment. As hereinabove indicated, it was their opinion that because of their ability not to amortize premiums on municipals held less than thirty days, thus resulting in a tax loss on the sale, they could, although realizing a lower return on their initial investments, still ultimately realize a larger after-tax return thereon than could the ordinary investor. Kuhn, Loeb & Co. and such other dealers, by the described buying and selling "daisy-chain" operation of passing tax losses on to one another, attempted to take maximum advantage of this assumed loophole.

Plaintiffs rely on the Report of the Senate Finance Committee with respect to section 2 of the Technical Amendments Act of 1958.[10] This report noted that "[u]nder present law * * * the general rule [required] the investor [to] reduce his cost for the [high-interest, tax-exempt municipal] bond each year by a pro rata portion of the premium," and that "[h]e [the investor] is given no tax reduction for this premium written off * * * since the premium reflects the receipt of tax-exempt interest income by the investor." It went on to state, however, that "[a]n exception is made under existing law to the rule described above for dealers in municipal bonds" since "[t]hese dealers are not required to write off premiums on [short-term] tax-exempt bonds which they hold for less than 30 days," which exception, it was noted, was made by the Revenue Act of 1950 "in order to prevent unduly complicating the accounting procedures

---

10. S.Rep. No. 1983, 85th Cong., 2d Sess. 13–14 (1958–3 Cum.Bull. 922, 934–35), U.S.Code Cong. & Admin.News 1958, p. 4791, the pertinent portion of which is reproduced in Appendix C of this opinion.

of dealers." The report then observes that "certain dealers * * * have been taking advantage of" the exception in that "[t]hey have been making a regular practice of holding high-interest exempt bonds for slightly less than 30 days and then transferring them in a so-called daisy-chain procedure to other dealers who similarly hold them for slightly less than 30 days." Thus, the Committee noted, "[t]he dealers engaging in these practices reduce their income by deducting the loss attributable to the reduction in the premium during the period they held the bond although collecting interest, attributable to the premium, which they did not include in their income because it was tax exempt." The Committee referred to this practice as "deducting the artificial losses attributable to the premiums when the bonds are sold or mature." The House bill proposed an effective date for the new bill. The Senate report, however, postponed the effective date (i. e., the bill was made "effective with respect to taxable years ending after December 31, 1957, with respect to bonds acquired after that date," instead of taxable years ending after November 7, 1956, as proposed by the House).

Plaintiffs argue that "the unmistakable inference to be drawn" from the Senate report is "that this ["daisy-chain"] practice had been legal under the 1950 Act and that it would continue to be legal until the effective date of the 1958 amendment." Pltf. Brief, p. 29. "[I]t is clear," they say, that Congress "regarded the 'daisy-chain' operation as an aspect of a dealer's normal operations and that bonds handled in this fashion were held primarily for sale to customers in the ordinary course of its trade or business." *Id.*, p. 30. To hold otherwise, it is contended, would apply the 1958 Act prior to its effective date, which would "thwart the explicit intention of the Congress." *Id.* Indeed, the "change in the effective date provision would be meaningless," they say, "if it were not intended to postpone the effectiveness of a *new* rule" and if the legis-

lation were only "to be declaratory of the old rule * * *." *Id.* The absence of a "no inference" clause in the new legislation is emphasized to buttress the contention that the existing law was not regarded as being unclear.

The "unmistakable inference" which plaintiffs draw from the Senate report concerning the legality of their practices under the then existing law is not evident. There is nothing in the Committee's statements to warrant the conclusion that it was making a technical and definitive legal ruling or interpretation. It was, instead, relating in critical fashion the activities of certain taxpayers and proposing a method of halting them. After noting the distinction under the statutes between "investors" and "dealers," the Committee described the "daisy-chain" activities of "certain dealers" and their action in reducing their income for tax purposes by "deducting the artificial losses." The more normal and rational reading of the language of the Senate report—particularly in view of the fact that there had been no court rulings on the question—is that the Committee was taking note of these dealers' activities and, if they did actually constitute under the law a normal dealer's activity involving transactions in securities held primarily for sale to customers in the ordinary course of business, as distinguished from "the general rule" applicable to "the investor," then the law would be changed. To conclude, as plaintiffs do, that the Committee was putting its stamp of legal approval on the activity until the effective date of the new amendment, and that for a court to declare the described activity as properly constituting that of an "investor" instead of the normal business operation of a "dealer" would therefore "thwart the explicit intention of the Congress," clearly constitutes a misreading of the report. This conclusion is buttressed by the fact that the extensive hearings on the 1958 amendments to the Code likewise reveal no investigation by either the House or Senate Committee into the validity of these deductions.

The hearings, however, do reveal that the Senate Committee recommended prospective application of the new provision because, while the amendment was implemented to guard at least against future "daisy-chain" operations, it also covered amortization of the premium on conventional municipal securities. It was, therefore, considered unfair, on a retroactive basis, to require of dealers who had acted in the normal posture of middleman "with respect to transactions in their stock-in-trade," the expensive bookkeeping reconstruction of premium amortization on bonds that they held either prior to, or upon the date of, passage of the amendment. Hearings on H.R. 8381 Before the Senate Committee on Finance, 85th Cong., 2d Sess. 125–26 (1958).[11]

Finally, in view of the above considerations, it seems clear that no significance is to be attached to the absence of a statement in the committee report or a provision in the legislation itself to the effect that no inference is to be drawn as to the past propriety of taking "daisy-chain" loss deductions. As stated, it seems plain that what Congress wanted to make explicit was that, regardless of such propriety in the past, the situation would not, by the elimination of the 30-day provision, even be able to arise in the future. Thus, Congress put to an end any possible abuse of the privilege it had granted dealers not to report amortization by withdrawing such privilege from all dealers for all premium bonds (except those sold at a gain). In this respect, of course, the 1958 amendment did change the prior law.

What the above review of the legislative history does make plain is that plaintiffs' contention that such history shows "unambiguous Congressional pronouncements approving the position of the Plaintiffs" (Pltf. Brief, p. 33), and that it "expresses the Congressional view and mandate that they [transactions of the kind here involved] be treated in the manner proposed by the Plaintiffs" (id., p. 21), must be rejected.

For all of the reasons hereinabove set forth, plaintiffs' joint petition should be dismissed.

### APPENDIX A

The pertinent portions of the Internal Revenue Code of 1954 (26 U.S.C. 1952 ed., Supp. V) are as follows:

§ 75. *Dealers in tax-exempt securities*

(a) *Adjustment for bond premium.*—
In computing the gross income of a taxpayer who holds during the taxable year a municipal bond (as defined in subsection (b) (1) primarily for sale to customers in the ordinary course of his trade or business—

(1) if the gross income of the taxpayer from such trade or business is computed by the use of inventories and his inventories are valued on any basis other than cost, the cost of securities sold (as defined in subsection (b) (2) during such year shall be reduced by an amount equal to the amortizable bond premium which would be disallowed as a deduction for such year by section 171 (a) (2) (relating to deduction for amortizable bond premium) if the definition in section 171(d) of the term "bond" did not exclude such municipal bond; or

(2) if the gross income of the taxpayer from such trade or business is computed without the use of inventories, or by use of inventories valued at cost, and the municipal

---

11. Mr. William M. Adams, Vice President of the Investment Bankers Association of America, testified:
    "We emphasize that this burden would be imposed, not only on the few transactions where the loophole was utilized by a few dealers, but on all transactions by all dealers in the tax-exempt bonds which constitute their stock-in-trade.

"We are distressed at a proposal that dealers should be required retroactively to make the necessary computations and tax adjustments with respect to transactions in their stock-in-trade. * * * Consequently, we urge that the effective date of section 3 be a date subsequent to final adoption of the bill." [at 126]

bond is sold or otherwise disposed of during such year, the adjusted basis (computed without regard to this paragraph) of the municipal bond shall be reduced by the amount of the adjustment which would be required under section 1016(a) (5) (relating to adjustment to basis for amortizable bond premium) if the definition in section 171(d) of the term "bond" did not exclude such municipal bond.

\*   \*   \*   \*   \*   \*

(b) *Definitions.—*

For purposes of subsection (a)—

(1) The term "municipal bond" means any obligation issued by a government or political subdivision thereof if the interest on such obligation is excludable from gross income; but such term does not include such an obligation if—

(A) it is sold or otherwise disposed of by the taxpayer within 30 days after the date of its acquisition by him, or

(B) its earliest maturity or call date is a date more than 5 years from the date on which it was acquired by the taxpayer.

(2) The term "cost of securities sold" means the amount ascertained by subtracting the inventory value of the closing inventory of a taxable year from the sum of—

(A) the inventory value of the opening inventory for such year, and

(B) the cost of securities and other property purchased during such year which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year.

\*   \*   \*   \*   \*   \*

## § 171. *Amortizable bond premium*

(a) *General rule.—*

In the case of any bond, as defined in subsection (d), the following rules shall apply to the amortizable bond premium (determined under subsection (b)) on the bond:

\*   \*   \*   \*   \*   \*

(2) *Interest wholly tax-exempt.—*

In the case of any bond the interest on which is excludable from gross income, no deduction shall be allowed for the amortizable bond premium for the taxable year.

(d) *Bond defined.—*

For purposes of this section, the term "bond" means any bond, debenture, note, or certificate or other evidence of indebtedness, issued by any corporation and bearing interest (including any like obligation issued by a government or political subdivision thereof), but does not include any such obligation which constitutes stock in trade of the taxpayer or any such obligation of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or any such obligation held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.

\*   \*   \*   \*   \*   \*

## § 1016. *Adjustments to basis*

(a) *General rule.—*

Proper adjustment in respect of the property shall in all cases be made—

\*   \*   \*   \*   \*   \*

(5) in the case of any bond (as defined in section 171(d)) the interest on which is wholly exempt from the tax imposed by this subtitle, to the extent of the amortizable bond premium disallowable as a deduction pursuant to section 171(a) (2), and in the case of any other bond (as defined in section 171(d)) to the extent of the deductions allowable pursuant to section 171(a) (1) with respect thereto;

(6) in the case of any municipal bond (as defined in section 75(b)), to the extent provided in section 75(a) (2); \*   \*   \*

## APPENDIX B

S.Rep.No.2375, 81st Cong., 2d Sess. 40–42, 77–78 (1950–2 Cum.Bull. 483, 512–14, 538–39), reads as follows:

### (1) *Premiums on tax-exempt bonds held by dealers*

Recent bond issues by some States and municipalities have had peculiar characteristics; they include several series maturing within short periods but with extraordinarily high interest rates. An example is to be found in a recent issue of bonds by a State, the aggregate obligation being for $50,000,000. The first five series of those bonds, requiring payment by the State of $1,600,000 annually in 1952 to 1956, had an interest rate of 4½ percent, although they were intended to yield from 0.65 to 1.20 percent; whereas bonds maturing in 1957 to 1974, intended to yield from 1.20 to 2 percent, had an interest rate of 1¾ percent. Similarly, a midwestern city recently sold a group of serial bonds, those maturing from 1951 to 1954 having an interest rate of 6 percent, whereas those maturing from 1955 to 1977 had an interest rate of only 2 percent.

A person who acquires such a short-term, high-interest bond, whether directly from the State or municipality or indirectly from a dealer or another person, must pay a very high premium. To acquire a bond which would pay interest of $60 per year and $1,000 at maturity 5 years hence the purchaser would be required to pay about $1,250.

In the absence of special statutory provisions, a person who held such a bond for 5 years would receive $300 of interest, which would be excludable from gross income and thus exempt from tax. But since he had paid $1,250 and received only $1,000 at maturity he would have a loss of $250, which could be deducted from ordinary income, if the bond were held for sale to customers, or deducted from capital gains if the bond were held by an investor. Of course, such a "loss" is not a real loss at all, since the premium of $250 is an offset to the extraordinarily high interest.

Actually, the yield on the bond over the 5 years is roughly, $300 less $250 or $50, which is the equivalent of 1 percent per year on the par value; or, allowing for semiannual recoupments of part of the premium, there is a yield of about 1 percent per year on the actual investment, which is a normal yield on such short-term municipal bonds.

To avoid the inequitable tax effects which would result from the deduction of such artificial losses, sections 125 and 113(b) (1) (H) were added to the Internal Revenue Code by the Revenue Act of 1942. With respect to State and municipal bonds, in the case of an investor, these provisions require the amortization of any premium paid. Thus, continuing the illustration, the basis of a bond acquired for $1,250, maturing in 5 years, would be reduced $50 per year, so that if it were sold for $1,200 at the end of 1 year, or redeemed for $1,000 at the end of 5 years, no capital loss would result. Since the interest on such bonds is exempt from tax, amounts of annual amortization of premium are not deductible.

Under existing law, however, dealers in securities, whether individuals, partnerships, or corporations, are not required to amortize such bond premiums. Section 125(d) specifically excludes bonds which constitute "stock in trade of the taxpayer or any such obligation of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or any such obligation held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Thus, a dealer in securities who inventories his securities on a cost basis or who does not maintain inventories can deduct as a loss the difference between the cost of such bonds and their selling price or the amount received at maturity. Dealers who inventory their securities at market prices automatically receive annual deductions of portions of the premiums, since an appropriate amortization is reflected in the market prices shown in their inventories, or in the

selling prices if the bonds are sold or mature during the year. It appears that such artificial losses, in substantial amounts, are availed of by dealers in securities generally, and particularly by members of underwriting syndicates and the security-dealer affiliates of large banks, who have transactions amounting to millions of dollars in State and municipal bonds, to reduce their tax liability on other income.

Section 203 of your committee's bill is intended to prevent the deduction of such artificial losses, without unduly complicating the accounting procedures of dealers. With respect to State and municipal bonds which have been held more than 30 days and which have a maturity or call date not more than 5 years from the date of acquisition by the dealer, the premium paid must be amortized. In the case of dealers who carry their bonds at cost, this amortization will reduce the basis so as to eliminate an artificial loss in the year of the sale or other disposition of the bond, and in the case of dealers who carry their bonds at market prices the amount of the amortization for any year must be used to reduce the cost of sales for that year.

In the House bill this provision was effective for taxable years beginning after December 31, 1949. Witnesses who appeared at your committee's hearings pointed out that the use of this effective date would require extensive and costly reexamination of transactions which occurred before notice was given of a change in the law by the enactment of the House bill. Therefore, your committee has amended the bill so as to require the amortization of the premium on all securities purchased on or after July 1, 1950, but in the case of securities held on June 30, 1950, such amortization will be required only with respect to taxable years beginning after that date.

It is estimated that in the long run the revenues under this changed procedure will be about $20 million higher annually than they would be if existing law were continued.

\* \* \* \* \* \*

### Section 203. Treatment of Bond Premium in Case of Dealers in Tax-Exempt Securities

This section is the same as section 202 of the House bill, except that your committee inserts subsection (c) to change the effective date of the amendments made by the section.

Subsection (a) of this section amends section 22 of the Internal Revenue Code by adding a new subsection (o) to require dealers in securities to make an adjustment for bond premium on certain tax-exempt bonds. The adjustment is required only in the case of "short-term municipal bonds," which are defined as obligations issued by a government or political subdivision thereof on which the interest is excludible from gross income, except such obligations which are sold or otherwise disposed of by the taxpayer within 30 days after the date of acquisition by him, or the earliest maturity or call date of which is a date more than 5 years from the date on which it was acquired by him. Under this definition if a dealer in securities purchases or otherwise acquires a tax-exempt bond issued by a State or city and sells the bond to a customer within 30 days after the date of its acquisition the adjustment provided for by the amendment made by this section of the bill will not apply. Similarly, if for example, the tax-exempt municipal bond acquired by the dealer on January 1, 1951, matures January 2, 1956, and if such bond cannot be called before such date, the amendment made by this section will not apply.

The adjustment required, in the case of a dealer in securities who computes his gross income from such trade or business by the use of inventories and values such inventories on any basis other than cost, is the reduction of cost of securities sold during such year by the amount equal to the amortizable bond premium which would be disallowed as a deduction if the dealer were an ordinary investor holding such bond. The term "cost of securities sold" is specifically defined as the amount ascertained

by subtracting the inventory value of the closing inventory of a taxable year from the sum of the inventory value of the opening inventory for such year and the cost of securities and other property purchased during such year which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year.

If a dealer in securities computes his gross income without the use of inventories or if his inventories are valued at cost he is required to make an adjustment similar to that which he would make were he an ordinary investor. Thus, such a dealer who sells or otherwise disposes of a short-term municipal bond during the year is required to reduce the basis of the bond by the amount of the adjustment which would be required under section 113(b) (1) (H) were he an ordinary investor.

Subsection (b) of this section amends section 113(b) (1) by adding new subparagraph (I) thereto, and section 125 by adding new subsection (e), for the purpose of providing a reference in these related sections to the new provisions contained in section 22(o).

Subsection (c) of this section, added by your committee, changes the effective date of the amendments made by the section, making such amendments applicable to taxable years ending after June 30, 1950, instead of to taxable years beginning after December 31, 1949. However, subsection (c) provides that, in the case of a taxable year beginning before and ending after June 30, 1950, the amendments shall be applicable only with respect to obligations acquired after such date. U.S.Code Cong.Serv. 1950, pp. 3093, 3133.

## APPENDIX C

S.Rep. No. 1983, 85th Cong.2d Sess. 13–14 (1958–3 Cum. Bull. 922, 934–35), reads as follows:

*Section 3—Dealers in tax-exempt securities*

Under present law where, because of a relatively high rate of interest, tax-exempt bonds of State or local governmental units are purchased at premium prices, the premiums generally must be amortized over the life of the bond. Under the general rule the investor must reduce his cost for the bond each year by a pro rata portion of the premium. He is given no tax reduction for this premium written off, however, since the premium reflects the receipt of tax-exempt interest income by the investor. As a result of this annual reduction in the basis of the bond, a sale of the bond will not indirectly result in a tax deduction for the premium.

An exception is made under existing law to the rule described above for dealers in municipal bonds. These dealers are not required to write off premiums on tax-exempt bonds which they hold for less than 30 days. Also under this section a dealer is not required to write off the premium on a tax-exempt bond where the maturity or earliest call date is more than 5 years beyond the date of acquisition of the bond. These 30-day and 5-year rules were provided as exceptions to the general rule by the Revenue Act of 1950 in order to prevent unduly complicating the accounting procedures of dealers.

It is understood that certain dealers in tax-exempt bonds have been taking advantage of the exceptions provided by these 30-day and 5-year rules. They have been making a regular practice of holding high-interest exempt bonds for slightly less than 30 days and then transferring them in so-called daisy-chain procedure to other dealers who similarly hold them for slightly less than 30 days. The dealers engaging in these practices reduce their income by deducting the loss attributable to the reduction in the premium during the period they held the bond although collecting interest, attributable to the premium, which they did not include in their income because it was tax exempt. A similar procedure has been followed with respect to high-interest municipal bonds having a maturity date of more than 5 years. In such cases also, dealers are holding the

bonds and deducting the artificial losses attributable to the premiums when the bonds are sold or mature.

The bill, as amended by the House, would eliminate this avoidance device by repealing the 5-year-maturity or call-date rule in present law and by requiring the writeoff of the premium by the dealer where the bond is held for less than 30 days if the bond is sold at a loss.

The House believed that it was necessary to require dealers to write off the premium only where the bonds are sold at a loss because as a general rule where the bonds are sold to other dealers, as is true under the "daisy chain" procedure, there is no dealers' profit resulting from transactions with customers. Thus, the House found it unnecessary to require dealers to amortize the premium on their tax-exempt bonds where the bonds were sold at a profit in their ordinary transactions with customers.

Thus, the House desired not to require the amortization of the premium where the bonds are held by dealers for less than 30 days except in those cases where it was believed there was likely to be tax avoidance. It was thought that to require the amortization in other cases represented an unnecessary bookkeeping requirement. Your committee believes that the same reasoning should be applied in the case of bonds with a maturity or call date of more than 5 years where the bonds are held for more than 30 days. In such cases also it would appear that tax avoidance would be unlikely to occur where the bonds are sold by a dealer at a gain. For that reason your committee has restored the 5-year rule and provided that dealers need not amortize the premium on bonds having maturity or call dates of more than 5 years from date of acquisition, irrespective of how long such bonds are held if they are sold by the dealer at a gain. Where these bonds are sold at a loss the amortization of the premium which is required, is to be made in the year of the sale.

The amendment made by the House bill would be effective with respect to taxable years ending after November 7, 1956, with respect to obligations acquired after that date. Your committee makes this provision as amended effective with respect to taxable years ending after December 31, 1957, with respect to bonds acquired after that date. U.S.Code Cong. & Admin.News 1958, p. 4801.