**RICH LUMBER COMPANY, Incorporated, Plaintiff, Appellant,**

v.

**UNITED STATES of America, Defendant, Appellee.**

No. 5085.

United States Court of Appeals First Circuit.

Oct. 4, 1956.

Jackson J. Holtz, Boston, Mass., with whom Hershel Zonderman, David A. Rose, and Holtz & Rose, Boston, Mass., were on brief, for appellant.

Helen A. Buckley, Atty., Dept. of Justice, Washington, D. C., with whom Charles K. Rice, Acting Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Washington, D. C., Anthony Julian, U. S. Atty., and Arthur I. Weinberg, Asst. U. S. Atty., Boston, Mass., were on brief, for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

WOODBURY, Circuit Judge.

This appeal from a judgment dismissing an action to recover a deficiency in income taxes and interest thereon assessed against and paid by the plaintiff presents but a single question. It is whether a conceded loss in an agreed amount sustained by the taxpayer as the result of its sale to the United States of certain timber lands in Vermont was "sustained during the taxable year" 1947 within the meaning of § 23(f) of the Internal Revenue Code of 1939, 26 U.S.C.A., quoted in the margin.*

The taxpayer is a corporation having its principal place of business in Massachusetts which kept its books and filed its income tax returns on the calendar year accrual basis. In 1921 it acquired a substantial tract of timber land in Bennington County, Vermont, and on May 1, 1947, after preliminary negotiations between its treasurer and the supervisor of the Green Mountain National Forest, it executed a Land Purchase Option and Contract on Form 1009 with the United States Department of Agriculture. Thereupon it ceased all lumbering operations upon the tract.

By the terms of this option and contract the taxpayer agreed to sell its Bennington County lands, said to contain 4793 acres, "more or less," at $9.25 per acre on condition that within twelve months its offer be accepted in writing and notice thereof be communicated to its treasurer. The contract further provided that during the option period it would not do or suffer any act by which the value or title to the lands might be diminished or encumbered, and that during that period the United States should have the right "at all necessary and reasonable times" to enter upon the land "for all national-forest purposes."

On May 20, 1947, the Secretary of Agriculture accepted the option on behalf of the United States subject to the approval of the National Forest Reservation Commission. The Commission gave its approval on the same day and the taxpayer received written notice of these actions on May 29, 1947. Thereupon the option agreement ripened into a mutually binding contract of purchase and sale. By the terms of that contract the taxpayer agreed to furnish at its expense an abstract, certificate, or other evidence of title satisfactory to the Attorney General of the United States, or should it fail to

---

* "§ 23. Deductions from gross income.
"In computing net income there shall be allowed as deductions:
* * * * *
"(f) Losses by corporations.

"In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise."

do so within three months of acceptance of the option to bear the cost of the same, and in addition agreed that if it should refuse to convey or fail to make satisfactory title, it would submit to condemnation by the United States at the contract price per acre. It further agreed that upon acceptance of the option the United States might upon written notice from the regional forester, but not otherwise, use, occupy and administer without charge any or all of the land for national-forest purposes. And it also agreed that it would bear "any loss or damage occurring prior to the vesting of satisfactory title in the United States of America by reason of the unauthorized cutting or removal of products [from the land] or because of fire" and that "in the event any such loss or damage occurs, the United States may refuse, without liability, to accept conveyance of said land, or it may elect to accept conveyance upon an equitable adjustment of the purchase price." The United States in return agreed to purchase the land at the contract price per acre, or, in the event the taxpayer could not make satisfactory title, to take by condemnation at the agreed price per acre so much of the land as the taxpayer actually owned, that is, had a paramount title.

Upon acceptance of the option the taxpayer abandoned its plan to set up a sawmill on the tract and purchased other timberlands for its use. It also promptly engaged the services of a competent title attorney who searched the records, prepared an abstract, and in August informed the taxpayer that in his opinion it had a marketable title except for claims made against three small parcels. The taxpayer fully settled the claims against two of the parcels in 1947 and by the end of that year the adverse claims against the third parcel had been settled but the papers necessary to effectuate the settlement had not been passed. Also in 1947 the United States started to survey the property to determine its exact acreage. This was the state of affairs at the end of the calendar year 1947.

In 1949 the taxpayer was informed by letter that the Government's survey revealed that there were only 4562.8 acres in the tract of which 42.3 were found not to belong to the taxpayer, and hence the net acreage to be acquired from it was 4520.5 acres. The letter went on to state that the tract was made up of many small parcels the boundaries of which were vague and indefinite and hence their contiguity was not clear. Wherefore, the letter continued, the United States could not obtain a safe title by deed and so would have to proceed by condemnation. The letter further stated: "The purpose of condemnation proceedings is not to acquire land against the wishes of the apparent owner but merely for the purpose of perfecting a title in the Government which cannot reasonably be accepted by deed. It is not the policy to proceed in condemnation under an option if some other party who did not execute the option has a superior title." This, the letter continued, was the reason for "dropping" the 42.3 acre parcel from the condemnation proceeding.

Condemnation proceedings were instituted by the United States in 1949 and in 1950 the taxpayer received $41,814.62 for its land, that is, $9.25 per acre for 4520.5 acres.

In its return for the calendar year 1947 the taxpayer reported a loss on this transaction of $98,658.08 and a net loss for the year of $84,640.40. In addition it filed an application for a net operating loss carry-back against its 1945 taxable income. Both the deduction and the application for carry-back adjustment were disallowed and in consequence the taxpayer was assessed a deficiency which it paid with the interest thereon in the amount of $31,108.60.

The amount of the taxpayer's loss is not disputed. The sole issue, as stated at the outset of this opinion, is whether the taxpayer "sustained" the loss in 1947. The District Court on the authority of Lucas v. North Texas Lumber Co., 1930, 281 U.S. 11, 50 S.Ct. 184, 74 L.Ed. 668, held that its loss was not "sustained" in that year and we agree.

■ Neither the statute nor the decisions construing it lay down any hard and fast rules for determining when a loss is "sustained" for the purposes of income taxation. The Supreme Court in Lucas v. American Code Co., 1930, 280 U.S. 445, 449, 50 S.Ct. 202, 203, 74 L.Ed. 538 said: "The general requirement that losses be deducted in the year in which they are sustained calls for a practical, not a legal, test." And the courts in applying this practical test have recognized that no single factor will invariably control determination of the question. Viewing the transaction "as a whole and in the light of realism and practicality", as the court said in Commissioner of Internal Revenue v. Segall, 6 Cir., 1940, 114 F.2d 706, 709, certiorari denied, 1941, 313 U.S. 562, 61 S.Ct. 838, 85 L.Ed. 1522, no doubt actual passage of title is a highly significant event, although maybe not always the controlling one. See Brown Lumber Co. v. Commissioner, 1929, 59 App.D.C. 110, 35 F.2d 880; Frost Lumber Industries v. Commissioner, 5 Cir., 1942, 128 F.2d 693. Certainly in the case at bar title to the taxpayer's timberland did not pass to the United States in 1947. Nor even did full possession pass to the United States in that year. The most that it acquired during that year in the way of possession was the right on written notice to enter upon the tract to make use of it for national-forest purposes; the right to use the tract for other purposes remained in the taxpayer provided it did not diminish the value of the land, as by cutting and removing timber. Thus the taxpayer could still use, or perhaps for a fee allow others to use, the property for recreational or any other purposes which would not reduce its value. And throughout 1947 the risk of loss by fire or unauthorized cutting remained in the taxpayer, and in the event of loss from either cause the United States could either refuse to take the land or take it at an equitably adjusted price.

■ While some of the incidents of ownership certainly passed to the United States in 1947 by no means all of them did. Important incidents remained in the taxpayer throughout that year, such as a qualified right of possession and the risk of loss. Furthermore the United States during that year was not unconditionally and irrevocably bound to take the property and pay the agreed price per acre. These factors bring the case within the scope of the decision in Lucas v. North Texas Lumber Co., supra, for in that case a calendar year accrual basis taxpayer was not allowed to accrue a gain from the sale of timber lands in 1916, the year in which it gave an option to purchase the same and in which the optionee found the title satisfactory, arranged for financing and gave notice of acceptance of the option, but was required to report the gain in 1917 when the transaction was actually closed. The Court said:

"An executory contract of sale was created by the option and notice, December 30, 1916. In the notice, the purchaser declared itself ready to close the transaction and pay the purchase price 'as soon as the papers were prepared.' Respondent did not prepare the papers necessary to effect the transfer or make tender of title or possession or demand the purchase price in 1916. The title and right of possession remained in it until the transaction was closed. Consequently unconditional liability of vendee for the purchase price was not created in that year. Gober v. Hart, 36 Tex. 139. Cf. United States v. Anderson, 269 U.S. 422, 441, 46 S.Ct. 131, 70 L.Ed. 347: American National Co. v. United States, 274 U.S. 99, 47 S.Ct. 520, 71 L.Ed. 946. The entry of the purchase price in respondent's accounts as income in that year was not warranted. Respondent was not entitled to make return or have the tax computed on that basis, as clearly it did not reflect 1916 income."

This language covers the case at bar.

The judgment of the District Court is affirmed.