Einer NIELSEN and Mildred C. Nielsen,
Plaintiffs-Appellees,

v.

UNITED STATES of America,
Defendant-Appellant.

Einer NIELSEN and Mildred C. Nielsen,
Plaintiffs-Cross-Appellants,

v.

UNITED STATES of America,
Defendant-Cross-Appellee.

Nos. 15399, 15400.

United States Court of Appeals
Sixth Circuit.

June 29, 1964.

William Waller, Nashville, Tenn., Waller, Lansden & Dortch, Nashville, Tenn., of counsel, for Nielsen.

Michael Mulroney, Department of Justice, Washington, D. C., Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Attys., Department of Justice, Washington, D. C., on brief, Kenneth Harwell, U. S. Atty., Nashville, Tenn., of counsel, for United States.

Before MILLER, O'SULLIVAN and EDWARDS, Circuit Judges.

**616**

EDWARDS, Circuit Judge.

This appeal involves two large stock transactions wherein a Nashville stockbroker partnership, J. C. Bradford & Company, acted as intermediary between seller and ultimate purchaser. In each Bradford had title to the stock more than six months, assigned the stock to its house "investment account," took a "profit" on the resales rather than a "commission," and the Bradford partners claimed the "profits" as capital gains in their income tax returns.

The Internal Revenue Department disallowed these sums as capital gains and reassessed them as ordinary income. This suit was filed by a Bradford partner (and his wife) who paid the resulting difference in tax and sought refund in the Federal District Court.

The District Judge found the facts to indicate that in one transaction (Knights Life Insurance Company) the stock was held by Bradford "solely for sale to the customer who had ordered it and that this was a sale to a customer in the ordinary course of business," Nielsen v. United States, 212 F.Supp. 801, 803 (M. D.Tenn.1962), within the meaning of Int.Rev.Code of 1954, § 1236(a) (2) [1] and hence was ordinary income. This decision the taxpayers have appealed to this court in appeal No. 15,400.

In relation to the other transaction (Phillips & Buttorff Corporation) the trial judge found a more complex set of facts not to fall within the classification of "ordinary course of business." As to this transaction he upheld the taxpayers' claim of capital gain and gave judgment for them in the sum of $7,116.38, plus interest. As to this, defendant, United States of America, appeals in appeal No. 15,399.

■ As to the plaintiffs' appeal No. 15,400 involving the Knights Life transaction, we feel the District Judge's finding of fact is conclusive. Bradford (through Raymond T. Smith, not a party herein) discovered that Knights Life stock was for sale at a figure they judged to be favorable. They sought and found a purchaser—American General Insurance Company—which signed a written purchase order for up to 75,000 shares of Knights Life. This order in its terms specifically negated any possible intent on the part of Bradford to purchase this stock as its own capital asset within the meaning of 26 U.S.C. §§ 1221 and 1222.[2] The order declared, "It is understood that you would not purchase the stock without this commitment from us."

The fact that by its terms the purchase order also allowed Bradford to hold the stock in its own name for six months did not serve to alter the fact that this stock

1. "§ 1236. Dealers in securities
"(a) Capital gains.—Gain by a dealer in securities from the sale or exchange of any security shall in no event be considered as gain from the sale or exchange of a capital asset unless—
"(1) the security was, before the expiration of the 30th day after the date of its acquisition, clearly identified in the dealer's records as a security held for investment or if acquired before October 20, 1951, was so identified before November 20, 1951; and
"(2) the security was not, at any time after the expiration of such 30th day, held by such dealer primarily for sale to customers in the ordinary course of his trade or business." 26 U.S.C. § 1236(a).

2. "§ 1221. Capital asset defined
"For purposes of this subtitle, the term 'capital asset' means property held by the

taxpayer (whether or not connected with his trade or business), but does not include—
"(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;" 26 U.S.C. 1958 ed., § 1221.
*     *     *     *     *
"§ 1222. Other terms relating to capital gains and losses
*     *     *     *     *
"(3) Long-term capital gain.—The term 'long-term capital gain' means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income." 26 U.S.C. 1958 ed., § 1222.

was, as the District Judge found, held for sale to American General Insurance Company in the "ordinary course of business."

Counsel for the taxpayers, however, argue with ingenuity and persistence that when the special limitation on capital gains for stockbrokers was created, the language used was "held for sale to *customers* in the ordinary course of business." (Emphasis added.) From the plural employed in relation to the word "customers" they deduce that stock purchased by a broker for one large customer is not subject to the prohibition.

Such a strained construction of statutory language would emasculate the obvious congressional intent, and violate the narrow construction accorded to exceptions to tax legislation. Corn Products Refining Co. v. Commissioner, 350 U.S. 46, 52, 76 S.Ct. 20, 100 L.Ed. 29 (1955).

We think the plural reference was to the total field of customers of stockbrokers and that it covered any single one of them. We do not construe § 1236 as excluding a large sale to one customer from the "ordinary course of business."

We also agree with the District Judge that Raymond T. Smith's participation in the proceeds of this transaction in nowise affects Bradford's relationship to this transaction under the applicable terms of the Int.Rev.Code of 1954.

As to the appeal No. 15,400, we find ample evidence to support the finding of the District Judge and hence affirm the judgment entered therein.

As to defendant United States of America's appeal No. 15,399 in relation to the Phillips & Buttorff transaction, the complex state of facts has previously been considered by this court in two other cases, Maggiore v. Bradford, 310 F.2d 519 (C.A. 6 1962), and Denney v. Phillips & Buttorff Corporation, 331 F. 2d 249 (C.A. 6 1964). We take judicial notice of the facts and the finding of constructive fraud in the first of these cases.

Judge Gray's opinion in the District Court (212 F.Supp. 801 (M.D.Tenn. 1962)) gives an accurate summary of this bit of financial legerdemain:

"In 1956, J. C. Bradford, partner in J. C. Bradford & Company, learned of the possible availability of a large block of stock of the Phillips & Buttorff Corporation. At Bradford's solicitation, Guy L. Comer of Nashville directed Bradford to begin acquiring stock in this corporation for his account. Bradford did acquire 75,721 shares, of which 55,000 were delivered and paid for.

"Guy L. Comer was President and a Trustee of Church of Christ Foundation, a charitable foundation, which had substantial investments, either in its own name or in the name of a wholly-owned subsidiary corporation. Herein, for the sake of clarity, the word Comer is used when reference is either to him, the Foundation or its subsidiary.

"Not having received delivery instructions or payment for 20,721 shares bought, Bradford discussed the matter with Comer, learned that the purchases had been for the Foundation and that Comer was contemplating the sale to Phillips & Buttorff of the stock of another company owned by the Foundation, if proper arrangements could be made.

"Alert to the possibility of a long-term capital gain, and properly so, Bradford proposed a plan for handling the transaction. Negotiations followed, an agreement was reached, contracts and options were drafted and signed, the options were exercised and sales made in accordance therewith.

"In essence, Bradford repurchased the 55,000 shares which had been delivered and paid for, gave Comer an option to purchase the total of 75,721 shares, Comer gave Phillips & Buttorff an option to purchase the stock in the other company, abovementioned, and Woodstock served as financing vehicle, posting as collat-

eral for the loans the Phillips & Buttorff stock owned by Bradford and stock loaned to it by Comer." Nielsen v. United States, supra at 804.

The trial judge then entered findings concerning the tax effects of this handling of the Phillips & Buttorff stock purchase:

"I find that after its repurchase of the 55,000 shares from Comer, under the agreements, Bradford held as principal, not as agent, all of the 75,721 shares of Phillips & Buttorff, that it held same thereafter for possible delivery under the terms of the option, that this was not a holding primarily for sale to a customer in the ordinary course of its trade or business.

"Accordingly, the Commissioner was in error in determining that the profit realized was ordinary income and not a gain from the sale or exchange of a capital asset.

"I have considered the fact that Bradford's repurchase of the 55,000 shares which it had delivered was at its cost, that it did not collect from Comer a commission for its services in the purchase of this block and the additional 20,721 shares. Many taxpayers are willing to forego immediate and certain short-term gains in the hope or expectation of long-term gains with their resultant tax advantages. This is not improper. I do not find it so in the instant situation." Nielsen v. United States, ibid.

As to the trial judge's finding that this set of option transactions was not "in the ordinary course of its trade or business," we find it easy to agree. But Bradford's handling of the 55,000 Phillips & Buttorff stock transaction had two well-defined stages.

In its first stage this was a simple stockbroker transaction—albeit a big one. A broker knowing of a willing seller found a ready buyer. On the latter's order the broker bought the stock from the seller and delivered it to the buyer and was paid for it by him. It had been the broker's agreement with the buyer that a commission would be paid. Bradford's testimony made it clear that at this point the broker's service had been performed and all that was necessary to "mature" the commission was Bradford's demand for Comer to complete the transaction. Up to this point obviously this transaction, too, was in the normal course of business.

No commission was in fact paid, however, because while Comer was seeking a method of financing payment of the other 20,721 shares which Bradford had purchased for him, Bradford conceived a plan which would both finance those shares for Comer and (as Bradford viewed it) achieve a capital gain for tax purposes for Bradford, as opposed to a commission which would be taxed as ordinary income.

The plan—described in the trial judge's statement of facts above—required Bradford to repurchase the 55,000 shares of stock which it had just purchased on Comer's order and sold and delivered to him. The sole purpose of this repurchase from Bradford's point of view was to recast the transaction for tax purposes.

"Q. Your plan was specifically designed so you would come under the capital gains tax, isn't that true?

"A. We were hopeful that that is the way it would work out, but it didn't have to work out that way.

"Q. But that is the basic format and the moving force behind this plan in this way, isn't it, sir?

"A. That was our objective.

"Q. Capital gains was the motivation for the plan?

"A. That's right.

"Q. Now, Mr. Bradford, it seems to be undisputed that you were entitled to a commission on the original purchase of this stock?

"A. Had we not bought it back from Mr. Comer and had he carried

it through, we certainly would have been entitled to a commission."

We believe as a matter of law that Bradford's legal entitlement to the income ultimately derived from this 55,000 shares of Phillips & Buttorff stock was fixed for tax purposes as of the first time that stock was delivered.

The Supreme Court has held that "The power to dispose of income is the equivalent of ownership of it" and, hence, that the tax applied when the income was earned, regardless of the earner's subsequent disposition of it. Helvering v. Horst, 311 U.S. 112, 118, 61 S. Ct. 144, 147, 85 L.Ed. 75 (1940).

Clearly the Phillips & Buttorff stock up to the point of Bradford's first delivery was not "held for investment" within § 1236(a) (1). It was stock purchased on a binding order from a customer in anticipation of a commission for services rendered and held "in the ordinary course of his trade or business" within § 1236(a) (2). As such, it was taxable as ordinary income under Section 61 of the Int. Rev. Code of 1954 which provides:

"§ 61. Gross income defined

"(a) General definition.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

"(1) Compensation for services, including fees, commissions, and similar items;" 26 U.S.C. 1958 ed., Sec. 61.

Construing the income provisions of the Revenue Act of 1918, the United States Supreme Court through Justice Holmes declared concerning a different but equally ingenious tax reduction device:

"[T]his case is not to be decided by attenuated subtleties. It turns on the import and reasonable construction of the taxing act. There is no doubt that the statute could tax salaries to those who earned them and provide that the tax could not be escaped by anticipatory arrangements and contracts however skilfully devised to prevent the salary when paid from vesting even for a second in the man who earned it. That seems to us the import of the statute before us and we think that no distinction can be taken according to the motives leading to the arrangement by which the fruits are attributed to a different tree from that on which they grew." Lucas v. Earl, 281 U.S. 111, 114–115, 50 S.Ct. 241, 74 L.Ed. 731 (1930).

Bradford's decision to defer collection of this commission in order to place the Phillips & Buttorff stock in a "held for investment" classification for six months did not serve to prevent this income from being subject to tax in the form in which it was originally earned.

As to that portion of gain which Bradford derived from the sale to Comer of the first 55,000 shares of Phillips & Buttorff stock, we hold that in all respects it represented ordinary income. This commission was, of course, ultimately paid as a part of the total purchase price of 75,721 shares. The amount to be charged as ordinary income can be found by taking the proportionate share of the total "profit" realized by Bradford on the Phillips & Buttorff stock which 55,000 represents to 75,721 total shares.

The trial judge found as a fact in reviewing the subsequent complex option transactions that in them Bradford became a principal. Insofar as this conclusion applies to the balance of 20,721 shares of the Phillips & Buttorff stock which had never been delivered, we do not agree with appellant United States of America that the District Judge was clearly in error. While the security deposited by Comer for the loans with which the Phillips & Buttorff stock was financed appeared more than ample, it is still true that the option agreement did not guarantee his ultimate purchase.

We find it hard to say that J. C. Bradford & Company had not at least

launched a raft on the sea of capital enterprise.

The judgment of the District Court is affirmed in appeal No. 15,400. In appeal No. 15,399 the judgment of the District Court is modified and affirmed. The case is remanded for entry of judgment in accordance with this opinion.