**J. C. BRADFORD and Eleanor A. Bradford**

v.

**The UNITED STATES.**

No. 339-69.

United States Court of Claims.

July 14, 1971.

William Waller, Nashville, Tenn., attorney of record, for plaintiff. Waller

Lansden, Dortch & Davis, Nashville, Tenn., of counsel.

Roger A. Schwarz, Washington, D. C., with whom was Asst. Atty. Gen. Johnnie M. Walters, for defendant. Philip R. Miller and Joseph Kovner, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

**PER CURIAM:**

This case was referred to Trial Commissioner Roald A. Hogenson with directions to make findings of fact and recommended conclusions of law under the order of reference and rule 134(h). The commissioner has done so in an opinion and report filed on January 20, 1971. Both parties have filed exceptions to the commissioner's opinion on the legal issues and his recommended conclusions of law. The case has been submitted to the court on oral argument of counsel and the briefs of the parties.

Plaintiff (see footnote 2) challenges the trial commissioner's conclusion that plaintiff is entitled only to short-term capital gain treatment on the profit from the sale of the shares of stock in issue. In support of its position, plaintiff has attached to its reply brief the affidavit of J. C. Bradford to the effect that the shares were in the name of J. C. Bradford & Company at all times material until August 7, 1957, which plaintiff claims was the date of sale. We have concluded that this affidavit does not change the result reached by the trial commissioner. The letter agreement of January 8, 1957, between Woodstock and Banks provided that—

* * * All shares of stock tendered as security hereunder shall be represented by certificates transferred in the name of a nominee designated by American General and approved by you [Banks], and otherwise in form for good delivery, free and clear of all

liens and encumbrances, with requisite transfer tax stamps affixed.

Since American General had the right under that agreement to designate the nominee, subject to approval by Banks, J. C. Bradford & Company was, in effect, its nominee. In view of the terms of the letter agreements, American General's liability was, as a practical matter, unconditional because, as the commissioner has concluded, the shares were in the name of its nominee in form for good delivery and nothing remained to be done except the payment of the purchase price. See findings 12 and 13, to which neither party has filed exceptions.

As supplemented by the foregoing, the court agrees with the commissioner's opinion, findings, and recommended conclusions of law, and hereby adopts the same, as hereinafter set forth, as the basis for its judgment in this case.* Therefore, plaintiffs are not entitled to recover and the petition is dismissed.

## OPINION OF COMMISSIONER

HOGENSON, Commissioner: This is a suit for refund of Federal income tax for the year 1957. The suit arises as the result of the determination by the Internal Revenue Service that certain shares of stock held by J. C. Bradford & Co., a dealer in securities, were held for sale to customers in the ordinary course of trade or business and were not capital assets under section 1221(1) of the Internal Revenue Code of 1954.[1] For the reasons appearing hereafter, it is held that such determination was erroneous. However, since the proper treatment of the profit on the sale of those shares was as a short-term capital gain at ordinary tax rates, plaintiffs are not entitled to recover and their petition should be dismissed.

J. C. Bradford, one of the plaintiffs herein and hereinafter referred to as plaintiff,[2] is the senior partner holding a 60 percent interest in J. C. Bradford & Co., hereinafter referred to as Company, a partnership engaged in the business of acting as a dealer in securities, broker and investment banker, and doing business primarily in Nashville, Tennessee. Company is a member of the New York Stock Exchange and several other stock and commodity exchanges, and also of the National Association of Securities Dealers.

The ordinary course of business of Company as a dealer in securities was to maintain an inventory of those securities in which it made a market and the sale of securities from such inventory for a merchant's profit. Subject to fluctuations in the market price during the period between purchase and sale, the merchant's profit was the spread between the bid and asked side of the market. As to securities in which it did not make a market, Company either acted as a broker, buying the security and selling it to the customer for a commission, or it bought as principal and sold simultaneously, making a spread equivalent to a commission as its profit. Company's underwriting was in connection with the public offering of stocks and bonds by groups of securities dealers. Each dealer would commit to buy a fixed amount of the general offering which it would then undertake to retail. The profit was the spread between the underwriting price and the retail offering price. Those securities which Company held in the ordinary course of business were carried in a general trading account out of which such securities were bought and sold. The firm's salesmen sold from that supply of stocks. Company also had "traders" who bought and sold those

---

* The opinion of DAVIS, *Judge* concurring in the result follows the opinion of the Trial Commissioner which has been adopted by the court.

1. All section references are to the Internal Revenue Code of 1954 and the regulations thereunder unless otherwise indicated.

2. Eleanor A. Bradford, the wife of J. C. Bradford, is a plaintiff in this action only because she joined with her husband in filing a joint Federal income tax return for 1957.

stocks on a wholesale basis with other dealers.

On occasion the partners of Company, either alone or in a joint account or syndicate with one or more outsiders, purchased securities with a view to realizing long-term capital gain. Where all of the partners desired to participate in proportion to their respective partnership interests, such a transaction was handled in the name of Company and on its books. In other cases, the individual partners entered into such transactions as individual members of a joint venture or syndicate. Such a syndicate needed a manager to handle the mechanics or housekeeping of the joint account, and it was convenient and practical for a securities dealer to act as manager because of available personnel and facilities for doing so.

When Company purchased securities for potential long-term capital gain as an investor, such securities were segregated from the trading account and were put in separate investment accounts. If, after such a purchase was made and designated in the firm's books as being held for investment, a customer placed an order for some or all of such shares and Company filled the order with the shares held for investment, it would be necessary for it to go through the mechanics of taking the shares out of investment, putting them into inventory and then selling them.

In the late fall of 1954 or early in 1955, Sam Cunningham, an investment banker in Pittsburgh, Pennsylvania, made known to Raymond T. Smith, hereinafter referred to as Smith, the availability for purchase of two blocks of stock in the Knights Life Insurance Company, hereinafter referred to as Knights Life. Cunningham was close to the estates of deceased executives of Knights Life, which estates held the stock.

In the latter part of 1956, plaintiff learned from Smith that a firm of brokers in Pittsburgh, Pennsylvania, was offering for sale two blocks of Knights Life Stock aggregating 55,348 shares.

They discussed the opportunity for profit arising from a purchase and resale of those shares since, in their view, the offering price of the shares was low in relation to the sound position and value of the company and its future prospects. The two men decided that if a large company could be committed to buy the stock, they could finance an initial purchase, carry the stock long enough to meet the holding period requirements for long-term capital gain treatment and then deliver the shares to the purchasing company. An agreement reached to pursue this prospect provided that Company and Smith had a joint account, with each having a 50 percent interest in the transaction. Company was involved in the joint account only because all of the partners desired to participate in proportion to their respective partnership interests.

Smith commenced negotiations with the Pittsburgh brokers for the purchase of the stock. Smith also entered into a discussion with the American General Insurance Company, hereinafter referred to as American General, regarding its possible interest in purchasing those shares. That discussion was conducted first by Smith and then by Smith in association with Einer Nielsen, a partner in Company.

Smith and Nielsen offered to American General a contract under which the sale of the Knights Life shares would be effected more than 6 months after the proposed acquisition of the original blocks from the Pittsburgh brokers. This was entirely satisfactory to American General because the delay had two advantages from its point of view. First, it gave American General time to accumulate $4 million in an orderly way. Second, it gave it time to move into the management picture of Knights Life to whatever extent it might be entered in an orderly way.

The discussion with American General resulted in a letter agreement, undated but actually signed on January 8, 1957, between American General and Woodstock Corporation, hereinafter referred

to as Woodstock. Woodstock was a corporation set up by Company to avoid personal liability on the borrowing of money in connection with certain securities transactions. It was wholly owned by another corporation, the stock of which was owned by two of the partners of Company and the wife of another partner. Woodstock acted solely as agent for the joint account composed of Company and Smith. It had no interest in the transaction with American General other than a fee which was paid to it for its services.

The letter agreement of January 8, 1957, between American General and Woodstock, written and signed by American General, addressed to and endorsed as accepted by Woodstock, provided:

This letter sets forth our understanding with respect to the following matters:

You agree to use your best efforts to acquire up to 75,000 shares of the Common Stock of Knights Life Insurance Company of America, a Delaware corporation, and to permit us to purchase, under the terms hereof, all such shares as may be acquired by you. You will keep us advised of such purchases of any such shares. We shall be obligated to purchase all shares acquired by you if you acquire at least 55,000 shares, and in the event of such purchase you agree, on or before March 31, 1957, to acquire such additional shares as may be necessary to make up 57,500 shares of stock.

This agreement shall terminate at the close of business on January 31, 1957, unless prior to that time you shall have acquired (and so notified us) at least 55,000 shares of such stock.

The purchase price to be paid by us for such stock, with transfer tax stamps affixed and otherwise in form for good delivery, (subject to no lien or encumbrance) and transfer into the name of our nominee, shall be $67.50 per share, to be paid in Houston funds against delivery of the stock certifi-

cates. The closing date shall be such date, no earlier than August 1, 1957, nor later than October 31, 1957, as you shall designate to us on at least ten days advance written notice, at which time we shall name a Houston bank at which the closing will take place.

The terms of this agreement are based upon the stock of Knights Life Insurance Company of America as presently constituted. If the outstanding shares of such stock shall be split or combined or if any stock dividend shall be declared thereon, then the number of shares of stock to be purchased hereunder and the purchase price per share to be paid therefor shall be adjusted so that the same price will be paid for the same percentage interest in the Company as herein contemplated. You shall be entitled to any normal (based on payments during 1956) cash dividends payable upon the stock to stockholders of record on any date during the continuance of this agreement. The amount of any increased dividend (in excess of the 1956 dividend rate) payment payable to you shall be applied to reduce the purchase price of the stock.

It is understood that you would not purchase the stock without this commitment from us, and that you may assign your rights hereunder to any bank or banks as security for any loan or loans you may procure for an aggregate amount not exceeding the purchase price above stipulated. Upon such assignment, and appropriate notice thereof to us, the assignee bank or banks may exercise all your rights under this agreement, and such exercise shall not be subject to any defense, set-off, counterclaim or recoupment by us, whether arising hereunder or by reason of any indebtedness or liability at any time owing by you to us.

If the foregoing correctly sets forth our understanding with respect to the matters to which it pertains, please

sign and return to us the enclosed copy of this letter which will serve as evidence of our agreement.

By letter agreement of the same date, January 8, 1957, Woodstock agreed with the First City National Bank of Houston and the National Bank of Commerce of Houston, hereinafter referred to as Banks, for $4 million in credit on the purchase of the Knights Life shares. This agreement incorporated the letter agreement between American General and Woodstock, and provided as follows:

Woodstock Corporation (herein called the "Company") hereby applies to you (herein called "Banks") for credit in an aggregate amount up to $4,000,000 subject to the following terms and conditions:

(1) The Company represents that it has entered into an agreement with American General Insurance Company of Houston, Texas (herein called "American General"), under the terms of which American General has agreed to purchase from the Company not less than 55,000 shares and not more than 75,000 shares of the common capital stock of Knights Life Insurance Company of America, a Delaware corporation (herein called "Knights") at a price of $67.50 per share, such purchase to be completed no earlier than August 1, 1957, nor later than October 31, 1957. A copy of such agreement is attached hereto as Exhibit "A" and incorporated herein by this reference.

(2) The funds obtained upon the credit hereby applied for will be used for the purchase of shares of stock of Knights. The credit actually extended shall not exceed $67.25 per share for each share purchased by the Company and tendered as security hereunder. No credit shall be extended unless at least 55,000 shares of stock of Knights shall be tendered or shall have been deposited as security hereunder. All shares of stock tendered as security hereunder shall be represented by certificates transferred in the name of a nominee designated by American Gen-

eral and approved by you, and otherwise in form for good delivery, free and clear of all liens and encumbrances, with requisite transfer tax stamps affixed.

(3) Each borrowing hereunder shall be evidenced by the Company's two promissory notes for equal principal amounts, payable respectively to each of the Banks, such borrowing to be secured by an equal number of shares of such stock (on the basis of not to exceed $67.50 per share) on the form of note attached hereto as Exhibit "B". The Company shall have the privilege of prepaying such notes in whole or in part at any time and shall be required to pay all notes issued pursuant hereto concurrently with any purchase by American General of the shares of stock of Knights pledged hereunder; provided, however, that all payments on said notes shall be made in such manner that the payments received by each of the Banks will be the same. Until all of the stock pledged to the Banks hereunder has been sold to American General, the Company will not sell any other stock of Knights to American General.

(4) The Company shall give each Bank at least three (3) business days' written or telegraphic notice specifying the date and amount of each borrowing hereunder. The amount to be advanced by each Bank shall be paid in Houston funds. Any unused portion of the credit hereunder shall terminate at the close of business on January 31, 1957.

(5) The obligation of each of the Banks to make each advance hereunder shall be subject to the following:

(a) The receipt by them of an opinion of the regularly employed counsel of the Company, satisfactory in form and substance to the Banks, as to the due organization and existence of the Company; its corporate power to make and perform this agreement and to borrow hereunder; the due organization, execution, delivery and binding effect of this agreement and, when ex-

ecuted and delivered pursuant hereto, of the notes issued hereunder; that the making and performing by the Company of this agreement and the borrowings hereunder will not violate any provision of law or of the charter or by-laws of the Company or result in a breach of or constitute a default under any agreement to which the Company is a party; and that the shares of stock of Knights pledged as security for such advance have been duly and validly issued, are fully paid and nonassessable and are free and clear of any lien or encumbrance other than the pledge to the Banks.

(b) An instrument, or instruments, in form and substance satisfactory to the Banks, executed by the Company and pledging and hypothecating the shares of stock required to be deposited as security for such advance.

(c) Such evidence as may be required by Counsel for the Banks, with respect to any of the matters referred to in paragraphs (a) and (b) above.

(6) The Company does hereby authorize and request each of the Banks to do or to cause to be done, on behalf of the Company, any act or thing which may be necessary or appropriate in order to carry out and perform the agreement between the Company and American General referred to above, including without limitation the delivery to or upon the order of American General of the stock certificates and stock powers which may be pledged hereunder and the receipt from American General of the consideration to be paid for such stock. To this end, the Company does hereby assign to the Banks its right under such agreement with American General and does hereby authorize and request American General to deal with the Banks, or either of them, on any matter with respect to such agreement and the performance thereof and does agree that American General shall be fully protected in doing so.

Houston was chosen as the source of credit because Houston banks were already familiar with American General. Smith advanced no funds for the purchase, but gave Company his promissory note for $2,500 which was returned when the transaction was completed. Company made the interest payments on Woodstock's loans.

On January 9, 1957, Company through Cunningham purchased 55,384 shares of Knights Life stock for $3,461,500, or $62.50 a share including a $1 per share purchase commission. An additional 132 shares were purchased on January 15, 1957, for $8,118, also $62.50 per share. Within 6 months of August 1, 1957, 1,390 additional shares were purchased. The gain or loss from the sale of those shares is not in issue. As agreed, Company received normal dividends paid by Knights Life during the period it held the shares.

On August 1, 1957, the 56,906 shares accumulated to that date were transferred to American General for $3,-738,420. As agreed, the proceeds were first applied to the extent necessary to liquidation of Woodstock's bank loans.

Smith's one-half interest in the Knights Life transaction was confirmed to him by Company in a letter dated January 9, 1957. Following completion of the transaction, Company rendered an accounting of its profit to Smith.

In compliance with one of the conditions of section 1236(a) (1), all shares purchased by Company were designated as held for investment on Company's books and records. The shares were so designated before the expiration of 30 days after the date of acquisition.

On its partnership return Form 1065 for the year 1957, Company reported as long-term capital gain the profits from the Knights Life transaction. On his 1957 Federal income tax return, plaintiff in turn reported his 60-percent share of Company's one-half of the profit on the Knights Life transaction also as long-term capital gain. An error in

computation of Company's return, carried forward to plaintiff's return was corrected in the computation of gain supplied to Smith. The correct amount of total gain derived from sale of the initial 55,384 shares was $276,920; the gain on the other 132 shares reported as long-term capital gain was $792. Plaintiff reported no net short-term capital loss on his return.

The Commissioner of Internal Revenue disallowed plaintiff's long-term capital gain on this transaction and asserted the resulting deficiency against plaintiff's 1957 return. Plaintiff paid the deficiency and timely filed this suit after his claim for refund was denied.

It is defendant's contention that plaintiff's share of the profit of Company on the sale of the Knights Life stock is not properly taxable as long-term capital gain from the sale of a capital asset because Company held that stock for sale to customers in the ordinary course of its trade or business. The relevant portion of section 1221(1) defines "capital asset" as "property held by the taxpayer (whether or not connected with his trade or business), but does not include * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." 68A Stat. 321 (1954), 26 U.S.C. § 1221(1). Section 1236, insofar as it is relevant herein, provides:

§ 1236. *Dealers in securities*

(a) *Capital gains.*—Gain by a dealer in securities from the sale or exchange of any security shall in no event be considered as gain from the sale or exchange of a capital asset unless—

(1) the security was, before the expiration of the 30th day after the date of its acquisition, clearly identified in the dealer's records as a security held for investment * * *; and

(2) the security was not, at any time after the expiration of such 30th day, held by such dealer primarily for sale to customers in the ordinary course of his trade or business [68A Stat. 330 (1954), 26 U.S.C. § 1236(a) (1) and (2).]

Whether Company held the Knights Life stock primarily for sale to customers in the ordinary course of business is essentially a question of fact, Stern Bros. & Co., 16 T.C. 295, 313 (1951), in which the crucial phrase is "to customers." George R. Kemon, 16 T.C. 1026, 1032 (1951). That phrase was added to the predecessor of section 1221(1) to see to it that speculative traders who purchased and sold securities for their own account and not for resale to customers could not claim the securities were other than capital assets. Mirro-Dynamics Corp. v. United States, 374 F.2d 14, 16 (9th Cir. 1967), cert. denied, 389 U.S. 896, 88 S.Ct. 215, 19 L.Ed.2d 214 (1967); see Amendment No. 66, H. Conf. Rep. No. 1385, 73d Cong., 2d Sess. (1934), 1939–1 Cum.Bull. (Part 2) 627, 632. Also, it is by now well settled that a taxpayer may be a dealer as to some securities and at the same time hold other securities as a trader or investor on his own account and not for resale to customers. As to the latter, he is not a dealer and securities so purchased are capital assets within the meaning of section 1221(1). E. Everett Van Tuyl, 12 T.C. 900, 905 (1949).

In *Kemon, supra,* 16 T.C. at 1032–1033, the Tax Court drew the following distinction between a trader on his own account and a dealer in securities, recently followed by this court in Brown v. United States, 426 F.2d 355, 364–365, 192 Ct.Cl. 203, 221–224 (1970):

In determining whether a seller of securities sells to "customers," the merchant analogy has been employed. [Citations omitted.] Those who sell "to customers" are comparable to a merchant in that they purchase their stock in trade, in this case securities, with the expectation of reselling at a profit, not because of a rise in value during the interval of time between purchase and resale, but merely because they have or hope to find a market of buyers who will purchase from them at a price in excess of their cost.

This excess or mark-up represents remuneration for their labors as a middle man bringing together buyer and seller, and performing the usual services of retailer or wholesaler of goods. [Citations omitted.] Such sellers are known as "dealers."[3]

Contrasted to "dealers" are those sellers of securities who perform no such merchandising functions and whose status as to the source of supply is not significantly different from that of those to whom they sell. That is, the securities are as easily accessible to one as the other and the seller performs no services that need be compensated for by a mark-up of the price of the securities he sells. The sellers depend upon such circumstances as a rise in value or an advantageous purchase to enable them to sell at a price in excess of cost. Such sellers are known as "traders." [16 T.C. at 1032–1033.]

An examination of the facts given above in the light of the distinction drawn in *Kemon, supra,* between a trader and a dealer indicates that Company was acting as a trader on its own account with respect to the Knights Life stock here in issue. Company performed no merchandising functions on those shares; it was not acting as a middleman bringing together buyer and seller, nor did it perform the usual services of retailer or wholesaler of goods. Company's status as to the source of supply of the stock was in no way different from that of American General. There is nothing in the record to indicate that the shares were not as easily accessible to American General as to Company. Company performed no services for which it would have been compensated by a mark-up of the price of the Knights Life shares. Rather, Company's profit was solely dependent on an advantageous purchase which enabled it to sell to American General at a price in excess of cost. Furthermore, Company did not hold the shares in Knights Life as stock in trade but clearly segregated those shares from the general trading account and identified them as held for investment.

Defendant relies heavily on Nielsen v. United States, 212 F.Supp. 801 (M.D. Tenn.1962), aff'd, 333 F.2d 615 (6th Cir. 1964), in support of its contention that the Knights Life shares were not held by Company as capital assets. In that case, involving the same Knights Life transaction and the treatment of the profit therein by another partner in Company, the trial judge found that the stock "was held by [Company] solely for sale to the *customer* who had ordered it and that this was a sale to a *customer* in the ordinary course of business." 212 F.Supp. at 803. (Emphasis supplied.) In affirming, the Court of Appeals stated: "* * * we feel the District Judge's finding of fact is conclusive." 333 F.2d at 616.

Clearly, the finding and decision in *Nielsen, supra,* is not binding upon this court. Plaintiff in *Nielsen* and plaintiff taxpayer in this action are each entitled to litigate his tax claim in a separate action, even though both were

3.  Treas.Reg. § 1.1236–1(c) (2) refers the searcher to the regulations under section 471 for the definition of a "dealer in securities." Treas.Reg. § 1.471–5 provides, insofar as it is relevant herein, that: "* * * For the purposes of this section, a dealer in securities is a merchant of securities, whether an individual, partnership, or corporation, with an established place of business, regularly engaged in the purchase of securities and their resale to customers; that is, one who as a merchant buys securities and sells them to customers with a view to the gains and profits that may be derived therefrom. If such business is simply a branch of the activities carried on by such person, the securities inventoried as provided in this section may include only those held for purposes of resale and not for investment. Taxpayers who buy and sell or hold securities for investment or speculation, irrespective of whether such buying or selling constitutes the carrying on of a trade or business, and officers of corporations and members of partnerships who in their individual capacities buy and sell securities, are not dealers in securities within the meaning of this section."

similarly situated with respect to the same transactions involved in both suits. This court is free to make an independent examination of the facts presented in this action and may then reach a different result from that which obtained in the *Nielsen* case, giving due regard to the rule of *stare decisis*. Willett v. United States, 406 F.2d 1346, 186 Ct.Cl. 775 (1969).

■ For reasons already set forth in the light of the above-stated distinction between a trader and a dealer, Company was acting as a trader on its own account with respect to the Knights Life stock and did not hold that stock for sale to a "customer" as that word is used in determining capital gain. Therefore, those shares were a capital asset in the hands of Company and properly subject to capital gain treatment at sale.

Defendant makes the further argument in its brief that if the Knights Life stock was held as a capital asset, plaintiff is entitled only to short-term capital gain treatment on his share of the profit because the stock was held for not more than 6 months. Section 1222(1). Defendant places primary reliance for this contention on Ted F. Merrill, 40 T.C. 66 (1963), aff'd per curiam, 336 F.2d 771 (9th Cir. 1964). In that case the Tax Court stated:

* * * we believe we must take into consideration in determining a taxpayer's holding period for purposes of section 1231 not only the dates on which bare legal title to the property passed but also the dates on which the benefits and burdens or the incidents of ownership of the property were acquired and disposed of in a closed transaction.

It is recognized that property, in the legal sense, means not the thing itself, but the rights which inhere in it. [Citation omitted.] Ownership of property is not a single indivisible concept but a collection or bundle of rights with respect to the property. Normally, ownership of real estate would be considered transferred on the date of delivery of the deed. But where delivery of the deed is delayed to secure payment of the purchase price or for some other reason such as the escrow arrangement here involved, we believe the intent of the parties as to when the benefits and burdens of ownership of the property are to be transferred, as evidenced by factors other than passage of bare legal title, must control for purposes of this statute. [40 T.C. at 74.]

This approach has been applied to the determination of holding period requirements under section 1222. Boykin v. Commissioner of Internal Revenue, 344 F.2d 889 (5th Cir. 1965); Karl R. Martin, 44 T.C. 731 (1965).

*Merrill, supra,* presupposes a closed transaction for tax purposes. In that case, the Tax Court derived the test of finality of the sale from the Second Circuit opinion in Commissioner of Internal Revenue v. Union Pac. R. R., 86 F.2d 637 (2d Cir. 1936) reading at 639:

■ A closed transaction for tax purposes results from a contract of sale which is absolute and unconditional on the part of the seller to deliver to the buyer a deed upon payment of the consideration and by which the purchaser secures immediate possession and exercises all the rights of ownership. The delivery of a deed may be postponed and payment of part of the purchase price may be deferred by installment payments; but for taxing purposes it is enough if the vendor obtains under the contract the unqualified right to recover the consideration. [Citations omitted.]

Later cases have criticized this test as being too narrow. The current rule in relation to consummation of a sale for tax purposes appears to be that of Commissioner of Internal Revenue v. Segall, 114 F.2d 706, 709 (6th Cir. 1940), cert. denied, 313 U.S. 562, 61 S.Ct. 838, 85 L. Ed. 1522 (1941) to the effect that:

■ There are no hard and fast rules of thumb that can be used in determining, for taxation purposes,

when a "sale" was consummated, and no single factor is controlling, but transaction must be viewed as a whole and in the light of realism and practicality, * * *

See also Rich Lumber Co. v. United States, 237 F.2d 424, 427 (1st Cir. 1956); Morco Corp. v. Commissioner of Internal Revenue, 300 F.2d 245, 246 (2d Cir. 1962); Clodfelter v. Commissioner of Internal Revenue, 426 F.2d 1391, 1393 (9th Cir. 1970). The Sixth Circuit has recently had occasion to reaffirm that rule in Commissioner of Internal Revenue v. Baertschi, 412 F.2d 494, 498 (6th Cir. 1969), reversing the Tax Court's reliance in 49 T.C. 289 (1967) on the test derived from Commissioner of Internal Revenue v. Union Pac. R. R., *supra*, and expressly declining to apply that test in the case before it. It was noted at 412 F.2d 498 that the Second Circuit, which gave birth to *Union Pacific*, has itself followed *Segall* in 1962 decision, Morco Corp. v. Commissioner of Internal Revenue, *supra*.

Turning first to the question of whether the sale of the Knights Life stock here in issue was final in the light of the rule in *Segall, supra*, the facts and circumstances in the instant case are convincing that as a practical matter the sale was consummated to the extent of 55,384 shares on January 9, 1957, and to the extent of an additional 132 shares on January 15, 1957.

Pursuant to the letter agreement between American General and Woodstock of January 8, 1957, American General obligated itself to buy *all* shares in Knights Life acquired by Woodstock up to 75,000 shares if Woodstock acquired at least 55,000 of such shares by the close of business on January 31, 1957. American General's obligation came into existence on January 9, 1957, when company purchased the 55,384 shares through Cunningham. When Company made the later purchase of 132 shares on January 15, 1957, American General was under a contractual obligation to purchase those additional shares, or a total of 55,516 shares in Knights Life.

The letter agreement, also of January 8, 1957, between Woodstock and Banks incorporated by reference the agreement between American General and Woodstock and provided that all shares of stock tendered as security would be represented by certificates transferred in the name of a nominee designated by American General and approved by Banks, and otherwise in form for good delivery, free and clear of all liens and encumbrances, with requisite transfer tax stamps affixed. Thus, in substance, all that remained to be accomplished was the payment of the purchase price. American General had an absolute right to title to the 55,516 shares upon such payment.

A factor often considered in determining whether a sale has been consummated, for tax purposes, is whether there has been such substantial performance of conditions precedent as imposes upon the purchaser an unconditional duty to pay. Commissioner of Internal Revenue v. Segall, *supra*, 114 F.2d at 710. The facts herein indicate that American General's liability was, as a practical matter, unconditional since the shares were in the name of its nominee, in form for good delivery and nothing remained to be done except the payment of the purchase price. Commissioner of Internal Revenue v. North Jersey Title Ins. Co., 79 F.2d 492, 493 (3d Cir. 1935). On the other side of the fence, Woodstock had no right to cancel. This is also a factor to consider. Commissioner of Internal Revenue v. Baertschi, *supra*, 412 F.2d at 498.

Furthermore, consummation of sale is indicated by Woodstock's ability to assign its rights under the January 8, 1957 agreement as security for bank loans not exceeding the purchase price per share and the right of any assignee bank to exercise Woodstock's rights under that agreement subject to no defense, set-off, counterclaim or recoupment by American General, and by Woodstock's assignment of such rights in the letter agreement with Banks of January 8, 1957.

■■ Since the sale of the shares in Knights Life was final for purposes of taxation, the question becomes one of when the parties to the transaction intended the benefits and burdens of ownership of the stock to be transferred. *Ted F. Merrill, supra* at 74. The intent of the parties must be ascertained in terms of what they intended to happen. *Karl R. Martin, supra*, 44 T.C. at 741. Clearly, couching the transaction in terms of an executory contract *to sell* will not make it such, if in fact it is something else. Gregory v. Helvering, 293 U.S. 465, 470, 55 S.Ct. 266, 79 L.Ed. 596 (1935); Higgins v. Smith, 308 U.S. 473, 477, 60 S.Ct. 355, 84 L.Ed. 406 (1940).

An examination of the agreements underlying this transaction indicates that American General and Woodstock intended to transfer the benefits and burdens of ownership of these shares no later than the moment of acquisition by Company and not at the later "closing" date. The January 8, 1957, letter agreement between American General and Woodstock provided that the purchase price was to be $67.50 per share. At the moment of acquisition, Company's profit on the sale was fixed. If the value of the stock decreased below the figure set forth in the agreement, American General had the burden of loss. If the stock increased in value, American General had the benefit. If there was a stock split or stock dividend, American General would receive the benefit as the number of shares to be purchased and the purchase price under the agreement were to be adjusted. While Company was entitled to normal cash dividends based on the 1956 rate, any dividends in excess of that rate would inure to the benefit of American General to reduce the purchase price per share.[4]

Company did have the burden of making the interest payments on the bank loans, but this was not an immeasurable burden and would have been taken into consideration in arriving at the purchase price to be paid by American General. As a practical matter, the significant incidents of ownership in the Knights Life stock such as appreciation and depreciation in value and the receipt of income on the stock beyond a calculated rate passed to American General as those shares were acquired by Company.

■ Consideration of all the evidence, in connection with the factors said by the courts to be relevant to the determination of when the holding period of property ends for purposes of section 1222, compels the conclusion that Company's holding period for the shares here in controversy began and ended with their acquisition. Therefore, Company, and in turn plaintiff, was entitled only to short-term capital gain treatment on the profit from the sale of those shares. Since plaintiff reported no net short-term capital loss on his return for 1957, plaintiff's share of the profit reportable as short-term capital gain was subject to tax at ordinary income rates in its entirety, and plaintiffs' petition should be dismissed.

DAVIS, Judge (concurring in the result):

I would follow Nielsen v. United States, 333 F.2d 615 (C.A. 6, 1964), affirming 212 F.Supp. 801 (M.D.Tenn. 1962), and dismiss the petition on the ground rejected by the trial commissioner—that taxpayer did not hold the Knights Life shares as capital assets but, rather, that the gain from the sale of the stock was ordinary income. Nielsen involved the very same transaction and a partner of the present plaintiff. I see no reason to disagree with the persuasive findings of the District Court, affirmed by the Sixth Circuit, that the taxpayer and his partners held the stock

---

4. It is significant that in permitting Company to retain normal cash dividends, American General was relinquishing only a limited benefit since Knights Life had paid the same $1 per share annual dividend for the previous 31 years. Undoubtedly the purchase price implicitly took that cash dividend into account as the agreement explicitly provided for the event should a dividend in excess of the 1956 rate be paid.

for sale to their customer, American General, in the ordinary course of their brokerage business. They performed the services of a broker or middleman, acquiring the shares for American General and carrying through on the transaction so that the latter ultimately obtained the securities. Without their customer's detailed written commitment, they would not have purchased the stock. The terms were all fixed or known in advance, including the profit. The whole arrangement strongly suggests the camouflaging of a brokerage business transaction by a thin veneer of investment-purpose. The participation of Smith, who was not a broker and may have had investment goals, did not change the character of the gain made by the Bradford Company partners, who were brokers and did not, in my view, have an investment purpose. *Cf.* Riddell v. Scales, 406 F.2d 210, 212–213 (C.A. 9, 1969); Tibbals v. United States 362 F.2d 266, 269, 176 Ct.Cl. 196, 203 (1966).

Since this ground—that the shares were not capital assets—is enough to dispose of the case, I do not consider whether, on the contrary assumption, the stock was held for more or less than six months.